**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BLACK BEAR ENERGY SERVICES, INC., | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No. 15-50 |
| | ) |
| | ) |
| YOUNGSTOWN PIPE & STEEL, LLC d/b/a DNV ENERGY, LLC | ) |
| | ) |
| | ) |
| Defendant. | ) |

| | |
|---|---|
| YOUNGSTOWN PIPE & STEEL, LLC d/b/a DNV ENERGY, LLC, | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| BLACK BEAR ENERGY SERVICES, INC., JOSEPH E. KOVACIC, III, MARKWEST ENERGY PARTNERS, L.P., OHIO GATHERING COMPANY, L.L.C., MARKWEST ENERGY OPERATING COMPANY, L.L.C., MARKWEST UTICA EMG CONDENSATE, L.L.C., MARKWEST UTICA EMG L.L.C., and MARKWEST LIBERTY MIDSTREAM & RESOURCES, L.L.C. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Counterclaim Defendants. | ) |

<u>**OPINION**</u>

CONTI, Senior District Judge

**I.    Introduction**

      Pending before the court in this diversity action are three motions for summary judgment.

(ECF Nos. 231, 233, 238.) The claims asserted by the parties in this case, some of which are at

issue in the motions for summary judgment, arise out of a contract entered into by counterclaim plaintiff Youngstown Pipe & Steel ("YPS") and counterclaim defendant Black Bear Energy Services, Inc. ("Black Bear"), pursuant to which YPS was to manufacture skid piping for Black Bear that allegedly complied with the standards set forth by counterclaim defendants MarkWest Energy Partners, L.P., Ohio Gathering Company, L.L.C., MarkWest Energy Operating Company, L.L.C., MarkWest Utica EMG Condensate, L.L.C., MarkWest Utica EMG, L.L.C., and MarkWest Liberty Midstream & Resources, L.L.C., (collectively "MarkWest"). There are material disputes of fact in this case, including whether Black Bear and MarkWest intentionally destroyed the skid piping to disrupt YPS' case.

For the reasons set forth in this opinion: the motion for summary judgment filed by MarkWest will be granted in part and denied in part; the motion for summary judgment filed by Black Bear and Kovacic will be granted in part and denied in part; and the partial motion for summary judgment filed by YPS will be denied. An appropriate order will be entered.

## II.    Procedural History

This case has a tortured procedural history, much of which is set forth in the court's memorandum opinion dated July 13, 2017 (ECF No. 121) and will not be repeated here. The procedural history relevant to the motions for summary judgment currently pending before the court is detailed below.

On July 11, 2019: (1) MarkWest filed its motion for summary judgment (ECF No. 231), a brief in support of the motion (ECF No. 236), and a concise statement of material facts (ECF No. 232); (2) Black Bear and Joseph E. Kovacic, III ("Kovacic") filed their motion for summary judgment (ECF No. 233), a brief in support of the motion (ECF No. 234) and a concise statement of material facts (ECF No. 235); (3) MarkWest and Black Bear filed a joint appendix to their respective concise statements of material facts (ECF No. 237); and (4) YPS filed a motion for

partial summary judgment (ECF No. 238), a brief in support of the motion (ECF No. 239), a concise statement of material facts (ECF No. 240), and an appendix (ECF No. 241).

On July 17, 2019, Black Bear filed a response in opposition to YPS' motion for summary judgment (ECF No. 243), a responsive statement of material facts (ECF No. 244), and an appendix in support of its response (ECF No. 246). On the same day, YPS filed an omnibus response to the motions for summary judgment filed by Black Bear and MarkWest (ECF No. 246), a responsive concise statement of material facts with respect to Black Bear's motion (ECF No. 247), and a responsive concise statement of material facts with respect to MarkWest's motion (ECF No. 249). On August 7, 2019, YPS filed an appendix to its responsive concise statement of material facts with respect to Black Bear's motion. (ECF No. 261).

On September 4, 2019, YPS filed a reply brief (ECF No. 262), a reply concise statement of material facts (ECF No. 263), and an appendix to its reply concise statement of material facts (ECF No. 264). On the same day, MarkWest filed a reply brief (ECF No. 265) and a reply to YPS' responsive concise statement of material facts (ECF No. 266), and Black Bear filed a reply brief (ECF No. 267), a reply to YPS' responsive concise statement of material facts (ECF No. 268), and an appendix in support of its reply (ECF No. 269). On September 12, 2019, MarkWest and Black Bear each filed a combined concise statement of material facts. (ECF Nos. 270, 271.) On September 13, 2019, YPS filed its combined concise statement of material facts. (ECF No. 272.)

The three motions for summary judgment having been fully briefed are now ripe to be decided by the court.

### III.    Factual Background

The factual background is derived from the undisputed evidence of record and notes the disputed facts of record. With respect to the dueling motions, each disputed fact is to be viewed

3

in the light most favorable to the nonmoving party for each motion. <u>Anderson v. Liberty Lobby,</u> <u>Inc.</u>, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

<b><u>MarkWest and Black Bear</u></b>

MarkWest had a natural gas compression station in Barnesville, Ohio, which was referred to as the "Humphreys Site." (ECF No. 237-1 ¶ 1.)

On February 19, 2013, MarkWest and Black Bear entered into a Master Services Agreement. (MarkWest Combined Concise Statement of Material Fact ("MCCSMF") (ECF No. 270) ¶ 2(a); ECF No. 261-3 at 1.) Black Bear performed "spot work on an as-needed basis" for MarkWest with the hope of doing more work for MarkWest in the future. (MCCSMF (ECF No. 270) ¶ 2(c), 2(e); ECF No. 261-4 at 2-3.) In October 2014, MarkWest awarded Black Bear two contracts with respect to the Humphreys Site: (1) to fabricate, deliver, and set one inlet separator skid ("inlet separator skid"); and (2) to fabricate, deliver, and set three header skids ("header skids"). (ECF Nos. 237-1 ¶ 36, 237-4 at 31-32, 237-4 at 8, 237-1 at 49.) Joe Greco ("Greco"), vice president of business development for Black Bear, (ECF No. 237-4 at 54), developed a relationship with MarkWest that lead to the October 2014 contract, (ECF No. 261-4 at 5). Dennis Loosli ("Loosli") was Black Bear's main point of contact at MarkWest with respect to the Humphreys Site. (ECF No. 261-4 at 4, 35.) Loosli testified that he hired Black Bear to fabricate and build the skids. (ECF No. 261-7 at 4.)

Black Bear did not believe it had the kind of welders that could perform "the type of work that was going to be done with the Humphrey[s] Site skids[.]" (MCCSMF (ECF No. 270) ¶ 2(c); ECF No. 261-4 at 2.) According to Greco, Loosli knew Black Bear did not have the experience necessary to fabricate the Skids and asked Black Bear "[t]o find a harmonious team that could compliment [sic] each other and around Black Bear's main scope of services, which

was the field support." (MCCSMF (ECF No. 270) ¶¶ 2(c), 3(c); ECF No. 261-4 at 2.) Loosli testified,[1] however, that it was his understanding that "Black Bear was a company that specialized in fabrication of…skids." (ECF No. 261-7 at 4.) According to Kovacic, Black Bear's president, (ECF No. 237-3 at 3), Loosli knew Black Bear was subcontracting the fabrication of the Skids to YPS, (MCCSMF (ECF No. 270) ¶ 3(d)).

## Black Bear and YPS

Employees of Black Bear met employees of YPS through a business advisory group. (MCCSMF (ECF No. 270) ¶ 2(h); ECF No. 261-4 at 6.) In or around the summer of 2014, Kovacic toured YPS' facility located in Youngstown, Ohio, (MCCSMF (ECF No. 270) ¶ 2(i); ECF No. 261-4 at 8-9), as part of Black Bear's "pursuit of a quality fabrication company to team up with[,]" (ECF No. 261-4 at 9). Kovacic was "impressed" with the people he met from YPS and their "pedigree" and YPS' "quality control programs" and machinery. (Id. at 10.) His goal was for Black Bear to build "a long-term relationship with [YPS]." (MCCSMF (ECF No. 270) ¶ 2(l); ECF No. 261-4 at 16.) Kovacic took "Vince" and "Mark" from YPS to the Humphreys Site for a "walk-through" with Loosli. (MCCSMF (ECF No. 270) ¶ 2(m); ECF No. 261-4 at 18.)

Greco via email requested a quote from YPS for the skids. (ECF No. 237-4 at 65.) He informed YPS that "[a]ll welding procedures will be in accordance to MARKWEST specs and procedures." (Id.) Greco provided YPS a link to a "Dropbox[,]" and explained: "The paint specs in this drop box [sic] are the paint specs to use on all Mark West [sic] projects from this day forward." (Id.) YPS provided Black Bear quotes for work on the skids and platforms.[2]

---

[1] According to Loosli, in July 2014, he believed Black Bear was fabricating and building the skids in Pennsylvania; indeed, he "did not know it had been subbed out to another party." (ECF No. 261-7 at 14.)

[2] YPS sub-subcontracted Team Steel Fabricators, Inc. ("Team Steel"), Schweizer Dipple, Inc. ("Schweizer"), and Columbiana Boiler Company, LLC ("Columbiana") to fabricate the

(MCCSMF (ECF No. 270) ¶ 2(n).) Black Bear awarded the job to YPS. (ECF No. 237-1 at 24, 26.)

In October 2014, Kovacic reached out to Mark Canter ("Canter"), general manager of operations for YPS (ECF No. 245-1 at 3), and introduced him to Harry Blain, from a company called "TEI[,]" (ECF No. 237-2 at 4). According to Canter, TEI does "midstream company inspection work…[an] [t]hey're the people that…help you get through your welding specifications and get yourself approved." (Id. at 4-5.) Kovacic "wanted to provide [YPS] some expertise that [sic] knew MarkWest protocol." (ECF No. 237-2 at 32.) In October 2014, Blain met with Greco and employees of YPS, i.e., Canter, Vincent Pelini ("Pelini"), Dan Tufaro, and Scott Eaton ("Eaton"), (ECF No. 237-2 at 32), "to go over…MarkWest's procedures…for welders working on MarkWest's projects[,]" (ECF No. 237-2 at 4; ECF No. 237-4 at 7). The purpose of the meeting with Blain was to acquaint Pelini "with TEI so that…[he] would learn, since this was…[his] first foyer into the midstream industry, specifically what MarkWest wanted and frankly what other members of the midstream companies would want in the fabricating of…header or inlet skids[.]" (ECF No. 237-4 at 7.)

On October 10, 2014, Greco sent an email to Kovacic that provided, in pertinent part, the following:

Inlet Platform quote

Platform 1 due by 10/9
Platform 2 due by 11/21

Inlet Separator Skid
Due by November 25

Process Header Skid
3 units due by November 25

---

Skids. (MCCSMF (ECF No. 270) ¶ 4.) Pelini took Kovacic to tour the Team Steel fabrication shop where Kovacic met Greco. (MCCSMF (ECF No. 270) ¶ 4(a)and (b).)

(ECF No. 269 at 9.)

On October 11, 2014, at 8:20 a.m., the inlet skid platform was shipped.[3] (ECF No. 269 at 17.) On or about October 11, 2014, a platform was delivered to the Humphreys Site by Nicolozakes Trucking & Construction, Inc. ("Nicolozakes Trucking). Nicolozakes Trucking was hired by Black Bear to transport the completed skids from YPS' fabrication facilities to the Humphreys Site. (MCCSMF (ECF No. 270) ¶ 5; ECF No. 241-1 at 4.)

On October 13, 2014, Kovacic forwarded Greco's above-quoted email dated October 10, 2014, to Eaton of YPS, and wrote, in pertinent part: "Below you can also see the expected completion dates of these projects." (ECF No. 269 at 9.)

On the same day, Black Bear issued YPS a purchase order for the inlet separator skid (#775584), which provided for a total price of $275,000.00, and a purchase order for the Process Header Skid (#77585), which provided for a total price of $578,973.00. (ECF No. 237-1 at 24, 26.) The purchase orders did not specify delivery dates. (Id.) The purchase order for the inlet separator skid provided, in pertinent part: "Ref. Assembly Drawing MRT-SK-130[.] Complete fabrication as per assembly drawing MRT-SK-130." (ECF No. 237-1 at 24.) The purchase order for the header skids provided, in pertinent part: "Ref. Assembly Drawing HUM-DS-2007A, HUM-ST-4302, HUM-ST-4302A, HUM-ST-4302B, HUM-ST-4303, HUM-ST-4303A and HUM-ST-04303B[.] Complete fabrication as per assembly drawings listed above." (ECF No.

---

[3] According to Pelini, MarkWest "fraudulently concealed their commitment to doing any kind of inspection at the wellsite once the…the last two skids were shipped." (ECF No. 237-4 at 25.) Pelini testified that YPS' claims against MarkWest are also based upon the Dropbox being incomplete because YPS did not receive material with respect to MarkWest's welding standards. (Id.)

237-1 at 26.) On or about November 18, 2014, a platform was delivered to the Humphreys Site by Nicolozakes Trucking.[4] (ECF No. 241-1 at 5.)

At some point, Greco requested a change in the order of delivery of the inlet separator skid and the header skids; Greco requested the inlet separator skid be delivered first. (ECF No. 261-8 at 46.) On November 26, 2014, Canter emailed Greco to tell him that shipping the inlet separator skid before the header skids created problems for YPS and would waste time, (ECF No. 261-9). Canter requested, among other things, that the header skids be delivered first. (Id.) Greco rejected Canter's request, (ECF No. 261-9 at 15), and the inlet separator skid became the priority of YPS[5] and was shipped before the header skids. (Id. at 47.)

In December 2014,[6] Nicolozakes Trucking delivered the inlet separator skid to the Humphreys Site. (MCCSMF (ECF No. 270) ¶ 6.) One of the three header skids was also supposed to be delivered to the Humphreys Site. (ECF No. 261-10 at 13.) There is a dispute, however, about whether the first of the three header skids was delivered to the Humphreys Site. An invoice from Nicolozakes Trucking provides that on December 24, 2014, a header skid was delivered to the Humphreys Site. (ECF No. 237-4 at 34.) Dean Nicolozakes, however, testified that he did not believe that the first of the three header skids was delivered to the Humphreys

---

[4]     The original delivery date for the inlet separator skids and the header skids was November 25, 2014. (ECF No. 269 at 5.)

[5]     It was Kovacic's preference for the header skids to ship first. (ECF No. 261-7 at 22.)

[6]     Prior to December 17, 2014, YPS delivered to Columbiana no more than eight "kits" to "either weld them, X-ray them, or if the whole unit got completed,…hydrostatic test them." (ECF No. 261-10 at 2.) YPS "pulled some of their work back" from Columbiana because "they were under time constraints to get it done" and Columbiana could not perform the work in the given time period. (Id. at 3.) YPS, however, did not impose a specific deadline on Columbiana to perform the welds. (Id. at 7.) On December 17, 2014, YPS engaged Schweizer because it was "in a bind" to do seven welds on 24" pipe. (MCCSMF (ECF No. 270 ¶ 4(h).) Schweizer completed the welds on December 21, 2014. (Id.)

Site; rather, the first of the three header skids was delivered to "a location near Barnesville [the "Barnesville facility"], which was right near…[the Humphreys Site]." (ECF No. 261-10 at 13.)

## MarkWest Identifies Problems with the Skids

On December 17, 2014, at 2:28 p.m., Loosli emailed Greco the following:

> Please see all the pictures below.
>
> Picture of the 1" socket flanges is showing that blackbear [sic] did not follow b [sic] 31.3 standard as you are required to have at minimum a 1/16" gap from flange to pipe. Which they are not. This needs to be corrected.
>
> Picture of the steel supports welded on the fittings is breaking mark west [sic] standard as it is not allowed. This will also need to be correct. They will have to be grinded off and UT afterwards.
>
> Picture of the 1" ball valves the drawing requires 3000lb ball valves and 1000 lb ball valves were used.
>
> Please let me know if you have any questions.

(ECF No. 237-4 at 55-56.) The subject line of Loosli's email was "Inlet skid phase 2 problems." (ECF No. 261-9 at 26.)

On the same day (December 17, 2014) at 3:38 p.m., Greco forwarded Loosli's email to Canter and Kovacic, writing:

> Mark please review the email and information below and get back to Joe Kovacic and I buy [sic] reply all ASAP
>
> Thank you [sic] we are all looking forward to your response.

(Id. at 55.)

At 3:51 p.m., Canter forwarded the emails from Loosli and Greco to Pelini, writing, in pertinent part:

> FYI…just received from Joe Greco. I have not looked it yet myself but wanted to send a copy to you.

(Id.)

At 5:03 p.m., Pelini emailed Greco. (Id. at 54-55.) He wrote:

Right now we are investigating the issues below. Can we set up a phone call tomorrow mid-morning to discuss?

(Id.)

At 9:04 p.m., Greco wrote the following email to Pelini, Canter, and Kovacic:

Joe Kovavic and I have a very busy schedule tomorrow yet we are setting aside 15 minutes at 1:00 p.m. tomorrow to discuss this with you.

What we need of you by 10am tomorrow is an email stating what your remedy of these situations are [sic] so we can think on said remedies to better speak with you on the 1pm call.

The email of which I speak is important to Joe K and I can discuss it amongst ourselves so we have some comments for the call. PLEASE make sure you send this email [sic] it's imperative to the 1 pm call. Without the email by 10am we will not be able to take the call at 1 pm because we will not have time to go into great detail over the phone without it. Time and timing is at a premium tomorrow and Joe and I have a meeting with Dennis and DJ Loosli tomorrow night.

In ending, MarkWest is impressed with your work for not ever fabricating for them before at this level. They were pleased and truly thought the work would have been more suspect so BRAVO to you for the great work you are doing. We just need to put these minor details to bed.

(ECF No. 237-4 at 54.)

On December 18, 2014, at 10:07 a.m., Canter wrote an email to Greco and Pelini with a subject line of "Inlet skid phase 2 problems." (ECF No. 261-9 at 5.) The email provided, in pertinent part:

Issues on Inlet Separator Skid to address…

1. Picture of the 1" socket flanges is showing that blackbear did not follow b 31.3 standard as you are required to have at minimum a 1/16" gap from flange to pipe. Which they are not. This needs to be corrected.
  · We agree that the expansion gap is required by code and should be corrected. We have reviewed the 1" piping that has not shipped and found a similar issue on a number of the pieces. We started repair work on these this morning. Please understand that we have pulling fitters and welders from the Header Skids to perform this repair work.
  · In regard to the shipped skid base and the fittings to repair on site…can Black Bear perform any of this repair work on site? The

10

work would include grinding off the welds at the socket joint, creating the small 1/16" gap as required, re-welding the socket joint. When a pipe section is completed it would need to re-hydrostatically tested to 1,125 psi.

2. Picture of the steel supports welded on the fittings is breaking mark west standard as it is not allowed. This will also need to be correct. They will have to be grinded off and UT afterwards.

·  We have not seen this called out on any Mark West standard or drawings so we were unaware of this Mark West requirement.
·  Do you have a standard that we can review?
·  Obviously, we will add this to our DO NOT DO list for future Mark West work.
·  Can Black Bear remove the temporary brackets, grind off the excess weld, and UT the areas on site?

3. Picture of the 1" ball valves. The drawing requires 3000# class ball valves and 1000# class ball valves were used.

·  We have reviewed all 40 of the drawings and cannot find a call out for 3000# ball valves on the 1" or ½" or ¾". The highest rated class call out for these valves that we found is for 600#. Here is the quick breakdown for 1" and ½" and ¾" ball valve call outs:
   i.   (5) 1" 150# Ball Valve, Full Port
   ii.  (45) 1" 600# Ball Valve, Full Port
   iii. (32) 1/2" 600# Ball Valve, Full Port
   iv.  (8) 3/4" 600# Ball Valve, Full Port
·  We knew the maximum rated class for these valves was 600# when were reviewed our valve purchases for this job and to meet or exceed the requirements we provided a higher class valve at 1000# for all.
·  We don't see that a correction is required on this item.

(ECF No. 261-9 at 5.) There is no evidence that Black Bear or MarkWest responded to Canter's email. (MCCSMF (ECF No. 270) ¶ 65.)

On the same day (December 18, 2014),  Loosli emailed Tonya Mitchell copying Greco, MarkWest employee Gary Borham, and Canter asking Mitchell to "increase the PO for Blackbear [sic] an additional $2,913.75," "highlight[ing] the areas of approved changes ... for the inlet skid at Humphreys Phase II," and explaining that "[t]he reason the change order request shows Morristown is due to that is the drawings we used." (MCCSMF (ECF No. 270) ¶ 91.)

At some point in time, Pam Payne ("Payne"), operations manager for Black Bear,[7] (ECF No. 237-3 at 40), provided YPS a "correction plan."[8] (ECF No. 245-1 at 75.) Payne testified that she told YPS:

> Get your welders certified to MarkWest specifications. You cannot use the materials that you have damaged by grinding on the piping or the fittings or – you've welder olets onto them. Get new materials. Get these skids built to the specifications. And I can – might buy you enough time to get it – make it happen.

(Id. at 75-76.) According to Payne, she gave YPS "the option to repair, rebuild, use new material so that they could deliver those to location the proper way, by the proper specifications before…[she] had to step in and take over." (Id. at 76.) Payne testified that Canter "was not interested." (Id.)

### MarkWest's Alleged Rejection of the Skids

Kovacic testified that Black Bear received a letter from MarkWest rejecting their work. (ECF No. 237-2 at 46.) At that point, Black Bear "kind of lost confidence" in YPS. (Id.) Kovacic testified that prior to receiving the letter, he remembered oral communications from MarkWest that it was not going to accept the skids. (ECF No. 237-2 at 48.) MarkWest expressed that the

---

[7]     Payne's job duties as operations manager included "[d]eveloping work with customers in the Ohio area, hiring, training, implementing policies and procedures for crews in the field, creating avenues of resources for equipment and materials needed for the work that [Black Bear was] doing at the time." (ECF No. 245-1 at 59-60.)

[8] Black Bear in response to interrogatories in this case stated:

> In December of 2014, YPS was provided the chance to remedy minor nonconformities with the skids that are the subject matter of this lawsuit. Even though they were able to repair those minor nonconformities, others emerged and it became apparent to MarkWest and Black Bear that YPS was incapable of complying with their contractual obligations. Finally, MarkWest demanded that YPS not be permitted to continue to attempt any repairs.

(ECF No. 245-1 at 95.)

skids were not "up to code." (Id. at 49-50.) According to Greco, MarkWest rejected all the skids fabricated by YPS. (ECF No. 237-2 at 37-38.)

Loosli and Jason Mack ("Mack"),[9] a third-party utility inspector for MarkWest, (ECF Nos. 261-7 at 8, 261-8 at 35), were involved in rejecting the skids, (ECF No. 237-3 at 6). Loosli inspected the skids on January 7 or 8, 2015. (MCCSMF (ECF No. 270) ¶ 7(a)(iv).) John Robson ("Robson"), the Humphreys Site inspector and an independent contractor for MarkWest, also inspected the skids. (Id. ¶ 7(a).) At some point, Loosli learned that the skids were fabricated by "non-MarkWest-certified welders." (ECF No. 237-3 at 14.) According to Loosli, he rejected all the skids because they were of "no value" to MarkWest. (Id. at 14-15.)

D.J. Loosli, Loosli's son, called Payne and asked her to come to the Humphreys Site to look at the skids, (Id. at 42-43). Payne took John Collins, Sr. ("Collins"), an experienced welder, with her to the inspection. (Id. at 45.) A welding boss from McCarl's (the lead "mechanical contractor who was there on-site to do the rest of the piping[,]" (ECF No. 261-7 at 29; ECF No. 261-10 at 20)),[10] accompanied D.J. Loosli and explained to Payne the reasons the skids were going to be rejected.[11] (ECF No. 237-3 at 45.) Collins privately told Payne that he agreed with the reasons set forth by the welding boss. (Id. at 45-48.)

There is a dispute of fact about whether the problems with the skids were correctable. According to Loosli, the following issues with the skids were "correctable:" (1) "[a]ngle iron

---

[9] According to Loosli, D.J. Loosli, Mack, and Robson were not certified welding inspectors qualified to inspect welds. (Id. ¶ 7(a)(iii).)

[10] McCarl's provided MarkWest a "lump sum proposal [of $2,571,000.00] to perform services on the Humphrey Compressor Station Piping and Equipment project" dated October 13, 2014. (ECF No. 261-10 at 36-37.) The proposal provided an anticipated start date of October 16, 2014, and final completion date of December 15, 2014. (Id. at 39.) The proposal did not include "[l]iquidated and consequential damages." (Id. at 42.)

[11] Payne and Mack each testified that McCarl's participated in inspections of the skids. (MCCSMF (ECF No. 270) ¶ 103.)

welded to pipe wall and fittings[;]" (2) "excessive penetration push-through[;]" (3) "unconsumed mig filler wire[;]" (4) "excessively rough surface on the root pass[;]" (4) "unconsumed bevel edge at the root[;]" and (5) "missing pipe because a drawing was missing." (ECF No. 261-8 at 20-22.) The corrections of these issues may have required the replacement of parts and a delay in the work. (Id.) According to Collins, however, the skids "couldn't have been fixed…[b]ecause you had to have cut them welds out and got your welder tested to MarkWest procedures." (ECF No. 237-2 at 16.) Collins explained the quality of the welding work on the skids as follows: "It was terrible, there was no procedure at all. It was welded with all kinds of different rods, different wire. It's pitiful." (ECF No. 237-2 at 15.) Collins explained that companies like MarkWest "all have different procedures for different types of work." (Id. at 18.) The welding performed on the skids by YPS "was nowhere near procedure[;]" indeed, the welding "didn't comply with anybody's procedure." (Id.) Collins asked YPS if the welders "had MarkWest papers[,]" i.e., were they certified MarkWest welders. (ECF No. 237-2 at 24.) He was told "[n]o, none of them has been tested." (Id.)

After Loosli inspected the skids, he asked Black Bear for "x-ray reader sheets, hydrostatic testing reports, and other documents from Black Bear" with respect to the skids. (MCCSMF (ECF No. 270) ¶ 7(a)(vi).) Black Bear responded that it requested those documents from YPS. (Id.) It would have "shock[ed]…[Loosli] tremendously" if YPS had x-ray reports showing the skids "passed." (ECF No. 261-7 at 34.) Greco went to the Team Steel facility to obtain the x-ray and hydrotest reports. (MCCSMF (ECF No. 270) ¶ 7(a)(vi).)

According to Payne, D.J. Loosli rejected the Skids on or about December 19, 2014.[12] (MCCSMF (ECF No. 270) ¶ 66.) During the week of December 19, 2014, Payne received a

---

[12]     According to Greco, "some" of the rework on the skids, e.g., "not the header skids but whatever was on-site[,]" began in December 2014. (ECF No. 261-5 at 12.) Greco explained: "[S]ome of that had to definitely be torn back out and redone." (Id.)

telephone call from D.J. Loosli who informed Payne that Black Bear had six weeks to remedy the issues with the skids or "Black Bear would be incurring $135,000.00 a week back charges to McCarl's due to delays by not being able to have skids in place." (ECF No. 261-10 at 21.) If Black Bear did not remedy the issues with the skids within the six weeks, "unions were going to attach to the project because they had workers waiting on product that should have been there over a month ago." (ECF No. 261-5 at 9.) MarkWest would have had "'millions' to pay to its installer for later delivery." (MCCSMF (ECF No. 270) ¶ 10(i).)

On December 19, 2014, Payne sent Canter an email with the subject line "Inlet skid for MW Humphreys[,]" which set forth the following:

> I know you are really busy so when you get a minute please call me…. We will [be] taking over the repairs to the skid and I need this information. Thank you for your attention to this matter.
>
> Component Code -Like MSS − 75 of B16.1, look for HEAT NUMBER to find code.
>
> B31.3 systems code, MUST be accompanied by film.

(ECF No. 241-1 at 16.) Canter forwarded the email to Kathi Ebie ("Ebie") of YPS. (Id.) Ebie responded to Canter, and copied Payne on the email, writing:

> Mark, Pam is looking for the xray results film from the testing. How do you have that info stored so that we can get this infor [sic] to Pam so she then can hand off to the inspector? Can Clint put his hands on this? or Dan?
> Pam, I believe the number for the components you are looking for is
> Conforms to asme/ansi b16.9

(Id.)

### YPS Ceases Work on the Skids

On December 31, 2014, a meeting was held at YPS with Black Bear, Team Steel, and JanX, a third-party inspection company hired by Black Bear to do a visual inspection of the

skids, (ECF No. 237-4 at 3; ECF No. 237-2 at 51).[13] (ECF No. 245-1 at 5.) According to Pelini, Greco, Kovacic, Payne, and others were present. (ECF No. 245-1 at 79.) They "talked about issues regarding the initial header skid and inlet separator skid." (Id.) After the meeting, Payne, Collins, and "Ralph," an employee of JanX, went to the Team Steel facility. (Id.) Payne and Ralph spent ten to fifteen minutes with the second and third skids. (Id.) Payne and Ralph reported that the second and third header skids would not pass a visual inspection. Collins reported "a number of issues[,]" including "[n]o brother-in-law welds[,]" the welders were not MarkWest-certified, and "some issues with the valves." (Id.) Canter called Pelini and "was very shaken[;]" he reported that "the inspection did not go well." (Id. at 79-80.) Pelini told Canter to "shut the plant down….[because YPS was] not going to do anymore work." (Id. at 80.) On January 1, 2015, Payne spoke with Canter and Ralph. (ECF No. 245-1 at 80.) They had a discussion with YPS' "x-ray person[.]" (Id.) According to Pelini, Payne and Ralph "ripped into…[YPS'] x-ray people." (Id.) At that point, "everything came to a halt." (Id.)

On January 2, 2015, Pelini "went down to the well site" and met with Greco, Payne, and Collins to inspect the inlet separator skid and the first header skid. (ECF No. 245-1 at 80.) Pelini described the meeting as follows:

> John Collins started out by saying, Your [sic] welders have to be MarkWest certified. I said to him, I stopped him immediately. He was standing on the skid, so I was looking up to him. I said, You [sic] have to be clear to me. You have to tell me what a MarkWest certification is because I've never heard of the term before[.] [It] was said when you said it to Mark Canter on New Year's Eve.
>
> So, he pounded his chest and he really didn't – he never told me what a MarkWest certification was, but he told me that – Here's what he said. He said, Listen [sic], very arrogantly, he said, I have been doing this for a long time. He said, I have worked with welders who have been welding for 30 years and they are not able to become MarkWest certified, many of them. And he looked at me in the eye and said, Your [sic] welders will never become MarkWest certified.

---

[13] According to JanX there were "serious issues" with the skids and they were not "satisfactory." (ECF No. 237-2 at 51; ECF No. 237-3 at 6.)

> And I said – I just gave up at that – I planned on being on that well site for a day. I was there for less than an hour.

(ECF No. 245-1 at 83-84.) At that point, "Payne kind of took over." (Id. at 84.) She walked over to a YPS skid and kicked valves on the skid with her steel-toed boots. (Id.) She said: "Anybody knows that these valves[14] aren't allowed on this skid." (Id.) Pelini replied that the valves were "on the print[.]" (Id.) Payne said: "It doesn't matter. Anybody who does work for MarkWest knows that those can't be on there." (Id)

Payne testified that YPS "had welded weldolets onto the piping which destroys the integrity of the pipe for lifting. You – that's not proper procedures or standards of anyone." (ECF No. 245-1 at 73.) According to Payne, she informed YPS "that they had ruined that pipe, that they need[ed] to stop all work and not destroy any more materials." (Id.)

On the same day (January 2, 2015), Kovacic emailed Pelini, Canter, Greco, Payne, and Brandon Jones to confirm a meeting on January 3, 2015, between Black Bear and YPS at Black Bear's office in Carnegie, Pennsylvania. (MCCSMF (ECF No. 270) ¶ 73.) By January 2, 2015, MarkWest had instructed Black Bear that YPS was not to be involved with the skids and that Black Bear should not communicate that to YPS because MarkWest "didn't want to get into a pushing match on getting their product back because they felt that if they were told of what they didn't want to hear that they would hold the…project hostage." (ECF No. 261-5 at 13.) In other words, Black Bear was not given the option to permit YPS to remedy the issues with the skids.

---

14    Robert L. Bates, II ("Bates"), construction manager for MarkWest submitted an affidavit, which provided, in pertinent part:

> The Skids were specially-fabricated, and incorporated vessels and valves owned/supplied by MarkWest.
>
> …
>
> The MarkWest-owned vessels were specially and specifically manufactured for the Project and not commercially available on the open market.

(ECF No. 245-1 at 144.)

(ECF No. 261-5 at 8.)[15] MarkWest recommended to Black Bear that it "tell…[YPS] no matter whether you are done or not, time is up, get it to Barnesville. Whatever you have, wherever you're at, stop, cease, desist, get it to Barnesville." (Id.) On January 2, 2015,[16] Payne forwarded to Greco a part estimate from Four Stars Pipe & Supply. (ECF No. 241-3 at 5-7.)

On January 4, 2015, Pelini, and Canter, among others, went to Black Bear's offices to meet with Kovacic and Greco. (MCCSMF (ECF No. 270) ¶ 76.) Black Bear's representative stated Black Bear was "good to go" and Black Bear wanted to create "a delivery schedule to finish the skids." (ECF No. 261-6 at 33.) By the end of the meeting, Black Bear and YPS created a delivery schedule, pursuant to which the last skid was to ship the "following Friday." (Id.)

### Shipment of the Second and Third Header Skids

On the next day, January 5, 2015, Loosli and Greco called YPS and Loosli instructed YPS to immediately ship the last two header skids because of union problems and penalties.[17] (MCCSMF (ECF No. 270) ¶¶ 10(a), 77.) YPS informed Loosli that the last two header skids

---

[15]     After "some of the skids" had been delivered to MarkWest, but before all the skids were delivered, MarkWest demanded that YPS not be permitted to continue to attempt any repairs on the skids. (MCCSMF (ECF No. 270) ¶¶ 8(e), 8(i); ECF No. 261-5 at 8.) Loosli demanded that YPS not have any more involvement in the skids. (MCCSMF (ECF No. 270) ¶ 8(f).)

[16]     On January 3, 2015, Canter emailed "jatinspection@gmail.com[,]" Tufaro, and Pelini. (ECF No. 241-1 at 22.) He wrote:

        Hi Joe,
        Here you go!
        Header Skid ISO Pipe Drawing Set (14 drawings)
        Thank you,
        Mark
(Id.)
[17]     MarkWest paid "extra charges to McCarl's…the mechanical contractor who was there on-site to do the rest of the piping" as a result of the late delivery of the skids. (ECF No. 261-7 at 29.) MarkWest may have been required to pay "penalties" as a result of the delayed delivery of the skids, but MarkWest and the mechanical contractor "worked it out" and there was no "lag time between when…[the] skids were delivered and [when the mechanical contractor began its work]." (ECF No. 261-7 at 19.)

were not finished. (ECF No. 261-6 at 23.) Loosli instructed YPS to ship the unfinished header skids and told YPS that "we will finish them when we get to the wellsite." (Id.) According to Pelini, Loosli meant *YPS* would finish the skids when they arrived at the wellsite. (Id.) A reasonable jury could find, however, that when Loosli told Pelini "*we* will finish" the skids, he meant MarkWest and Black Bear would finish the skids when they arrived at the wellsite. In any event, Pelini replied that "[t]he only way…[he was] going to ship those skids is if…[YPS met]…Loosli" and Black Bear at the Humphreys Site "to go through every one of those skids, every joint, every skid." (ECF No. 261-6 at 24.) Loosli agreed. (Id.)

On January 6, 2015, at 2:24 a.m., Greco emailed Loosli, Greco, and Dean Nicolozakes and wrote:

> As we spoke yesterday, it is imperative that we get these 2 skids out of Youngstown without alerting Team Steel or anyone else of any problems so we can have the skids on hand for rework. With this in mind I ask all involved to not alarm Team Steel of any problems until we have the last skid on the road. We should be in possession of both skids by noon latest…. Pending no interruptions we should be free of Youngstown soon thereafter. I asked that [the shipper's] transport team not communicate any move change to Team Steel….

(MCCSMF (ECF No. 270) ¶ 10(c).)

On January 6, 2015,[18] Nicolozakes Trucking picked up the second and third header skids from YPS to deliver them to Black Bear. (MCCSMF (ECF No. 270) ¶ 10(c).) The second header

---

[18]    On January 6, 2015, Canter sent an email to Loosli with a subject line "Last two Header Skids left our facilities today and Heat Treatment" to respond to a question posed by Loosli. Canter attached to the email hydrotest reports, weld maps, and welder qualifications for the second and third header skids. (MCCSMF (ECF No. 270) ¶¶ 7(a)(viii), 78.) Canter wrote:

> The last two header skids have shipped from our facility including the remaining 24" pipe section and 16" pipe section. Both of these pipe sections require a few welds to complete.
> …
> This is a 'preliminary' package since after a quick look I see that we're missing documents which I will get corrected. In regard to the Inlet Separator Skid and Header Skid #1 we're reorganizing the documents so we can deliver an improved comprehensive package of all the skids for your records.

skid "shipped complete." (ECF No. 245-1 at 81.) When the third header skid shipped, "there was one pipe section…that wasn't complete." (Id.) Unbeknownst at the time to YPS, Black Bear had arranged for Nicolozakes Trucking to deliver the skids to the Barnesville, Ohio site (as opposed to the Humphreys Site). (ECF No. 237-2 at 52; ECF No. 237-4 at 34.)

After the last skid left the YPS facility, representatives from YPS left to go to the Humphrey's site for the meeting with Loosli and Black Bear. (ECF No. 261-6 at 24-25.) When they called the site, however, "they were told not to show up." (Id. at 25.) Once YPS learned[19] that the last two header skids were delivered to the Barnesville facility, it realized that it was not going to be paid. (Id.) YPS believed the Barnesville facility was owned by MarkWest, and, at first, YPS was denied access to the facility. (Id.) "[E]ventually" YPS was permitted access inside the Barnesville facility. (Id.) By the time YPS was permitted inside the Barnesville facility, "there was pipe laying all over the ground." (ECF No. 261-6 at 25-26.) The representatives from YPS did not examine the identified problematic weld joints; rather, they "assumed that some of that product" belonged to YPS. (Id. at 25.)

On January 6, 2015, Greco emailed Canter and Eaton to request invoices and receivers needed for an audit and inspection of the skids. (MCCSMF (ECF No. 270) ¶ 80.) Greco in the email did not state that the skids were rejected. (Id. ¶ 81.) The next day, January 7, 2015, Canter

_____

(ECF No. 261-9 at 31.) There is no evidence that Loosli responded to the foregoing email. (MCCSMF (ECF No. 270) ¶ 79.)

[19]     On January 15, 2015, Eaton (of YPS) wrote an email to Pelini with a subject line of "Black Bear." (ECF No. 241-3 at 23.) The email provided, in pertinent part:

> I was told through a friend that has a relationship with…[Nicolozakes Trucking] that the skids were not delivered to Mark West [sic] last week. He said the guy he spoke with thought it was odd but that they were told at the last minute to deliver to a different warehouse location in the Barnesville area just off I70. I can find out exactly where they are if you need me to.

(Id.)

replied to Greco's email with a "complete package of the Inlet Separator Skid Receivers." (Id. ¶ 82.) There is no evidence that Greco responded to Canter's reply email to notify YPS that the skids were rejected. (Id. ¶ 83.)

<b><u>Black Bear's Repair of the Skids</u></b>

Loosli initially intended to have another company perform the correction work on the skids; instead, he permitted Black Bear "to save their company name with MarkWest" and fix the problems with the welds. (ECF No. 237-3 at 15.) Loosli told Black Bear that if it wanted to continue working on the skids, it had to perform the work itself "with qualified procedures, welders, to MarkWest's and the 31.3 specs." (ECF No. 261-7 at 26.) Loosli asked Black Bear to "see the welders and the craftsmen that…[were] going to do the work" and he had Black Bear perform the work "at a facility right by…[Loosli's] job." (ECF No. 261-8 at 12.) Loosli "made sure…[MarkWest] inspected…the welds personally to make sure they could handle the work." (Id.)

In January 2015, a "rework schedule" was created. (ECF No. 261-4 at 28.) Kovacic reviewed the rework schedule, pursuant to which "time was of the essence." (Id.) Kovacic testified that Black Bear felt like it was "pigeonholed[,]" i.e., it "didn't have a lot of options that…[it] thought…[it] could control the outcome." (Id.)

Payne was the project manager for repairing the skids. (ECF No. 261-10 at 28.) Her job included:

> Finding the building, getting a building set up for it, getting the materials ordered, make sure the materials met spec and certifications, making sure all the welders were certified by MarkWest certifications, collecting documents for MarkWest to be turned over to MarkWest, scheduling welders, going through ISOs every day.
> …
> [ISOs are] a plan page of how it's to be built with the measurements on it and the size and the specs, coordinating the subcontractors for hydro testing, purchasing tools to paint, sprayers, that sort of thing, pretty much the gopher.

(ECF No. 261-10 at 28-29.) When asked what was involved in the process of "getting the welders MarkWest" certified, Payne testified as follows:

> Testing. I'd have to set up and buy the pipe and then MarkWest – I think TEI actually is a MarkWest tester, buy the pipe, and then schedule the test with TEI, then you contact MarkWest welding inspectors, have them come and observed the test, and if they pass or not. It's usually a branch and – it's what's [sic] we call in 1104. Then they cut that out. And we go through what will we call a destructive test to see if it holds and the welder passes or doesn't pass. All my welders passed but one, and he did not work on the project.

(ECF No. 261-10 at 29.) The foregoing process took Payne "[a]bout two days" to complete.[20]

(Id.)

Black Bear wanted to reuse as much material as it could to repair the skids "to hold cost down." (ECF No. 261-10 at 30.) Payne explained the reused material as follows:

> We reused a T. We reused the frames, the skid part of it that the piping was attached to. We reused some of the bolts for the supports to bolt down to. We tried to salvage as much as that as possible to keep costs down.

(ECF No. 261-10 at 31.) Black Bear did not reuse the piping from Team Steel to repair the skids because it was damaged, i.e., there were "weld marks…grinding marks…[n]umerous dings and nicks and hits" on the piping. (ECF No. 261-10 at 30.) The piping that was not reused "was sent to a scrap yard, and all the bad welds was [sic] cut off and taken to Black Bear, stored at Black Bear" in Finleyville, Pennsylvania. (Id. at 31; ECF No. 237-4 at 29.) The piping that was not reused was "[p]ut on pallets and shrink wrapped." (ECF No. 261-10 at 32.)

MarkWest wanted to inspect the work "if not daily[,]" which meant the work could not be performed in Youngstown, Ohio. (ECf No. 261-6 at 14.) Black Bear performed the work at a third-party fabrication facility on Mt. Olivett Road "right by…[Loosli's] job." (ECF No. 261-6 at 13; ECF No. 261-8 at 115.) Loosli visited the facility in which Black Bear was performing the rework once or twice a week. (ECF No. 261-7 at 15.) Someone from MarkWest oversaw the

---

[20] According to Loosli, welders can be "MarkWest certified" in four hours. (MCCSMF (ECF No. 270) ¶ 95.)

welder certification for the rebuilt skids. (MCCSMF (ECF No. 270) ¶ 11(b).) Collins participated in the reworking of the skids. (ECF No. 237-2 at 23.) He viewed every weld that was done on the skids by YPS. (Id.) He testified that he "could see something wrong with every weld…[he] looked at." (Id.)

By the end of January 2015, Black Bear reworked the skids and fixed the problems pointed out by MarkWest with respect to the welds (ECF No. 237-3 at 15, 75.) MarkWest accepted the reworked skids from Black Bear. (ECF No. 237- at 34.) MarkWest paid Black Bear for its work. (ECF No. 237-3 at 15; YPS CCSMF (ECF No. 272) ¶ 3.) In other words, Black Bear was "paid in full[, i.e., $853,973.00] by MarkWest for all the base contract work that was the subject of the purchase orders entered into between Black Bear and MarkWest[.]"[21] (ECF No. 237-3 at 9; ECF No. 237-1 at 24, 26.)

### Mack's Letter Rejecting the Header Skids

Payne requested that Mack put into writing the issues with the skids. (ECF No. 261-8 at 32.) On January 12, 2015, Mack emailed a letter that he wrote to reject the skids to Payne. (MCCSMF (ECF No. 270) ¶ 7(b).) The letter provided, in pertinent part:

> Upon delivery of 2 skids to Mark West Humphry's [sic] compressor station, an inspection of materials and workmanship was conducted. The skids had been found to be unsatisfactory as per Mark West and ASME 31.3 Weld and Pipeline specs. Inlet skids and Header skid had the following unacceptable issues –
>
> - Angle iron welded to Pipe wall and fittings.
> - Excessive penetration (push-through).
> - Unconsumed mig filler wire (whiskers).
> - Excessively rough surface on root pass.
> - Unconsumed bevel edge at root.
> - Temporary attachment weld bead remnant and grinding on flange surfaces.

---

[21]     On January 16, 2015, MarkWest wrote Black Bear a check for $62,265.80, (ECF No. 241-4 at 8); and a check for $60,000.00, (ECF No. 241-4 at 9). On January 22, 2015, MarkWest wrote Black Bear a check for $67,000.00. (ECF No. 241-4 at 7.) On January 29, 2015, MarkWest wrote Black Bear a check for $120,871.12. (ECF No. 241-4 at 7.)

- Missing pipe / incomplete skid.

MarkWest Energy Partners, L.P. is committed to providing an environment built on the highest standards. We expect these standards to be present in all contractors we deal with. The materials and quality of work found in the delivered product to Humphry's [sic] compressor station has been rejected by our site inspector and corrections have been provided by the project manager. All codes and standards have been provided prior to a work order being issues. Please notify us if there is further clarification required.

(ECF No. 237-4 at 62.) On the same day (January 12, 2015), Payne forwarded the letter to Kovacic and Mike Kovacic, another Black Bear employee, and Mike Kovacic emailed the letter to Greco. (ECF No. 237-4 at 60.) Mack testified that the issues cited in the foregoing letter related only to the header skids and not to the inlet separator skid. (ECF No. 261-8 at 37.) According to Loosli, Mack did not have the authority[22] to reject skids on behalf of MarkWest. (ECF No. 261-7 at 9.) Loosli first reviewed the foregoing letter during his deposition on October 9, 2015. (Id. at 10.) MarkWest "[n]ormally" would place a rejection of equipment in writing. (ECF No. 261-8 at 9.)

## Black Bear's Rejection Letter to YPS

On the same day (January 12, 2015), Pulito, who represented Black Bear, wrote a letter to YPS. (ECF No. 241-3 at 18.) It provided, in pertinent part:

It has come to my attention that your recently delivered several skids (the "Skids") related to a project for which Black Bear was contracted. Please be advised that this letter serves as notice that Black Bear believes the work you provided was deficient.

The deficiencies include but are not limited to the following:

1. The Skids were not fabricated, as required, by MarkWest certified welders;
2. Angle iron welded to pipe wall and fittings;
3. Excessive penetration (push-through);
4. Unconsumed mig filler wire (whiskers);

---

[22] Mack testified that the letter was "more than likely" prepared "during that time that Pam had expressed Dennis being difficult to get a hold of and get a response from and she needed that response…." (ECF No. 261-8 at 34.)

5. Excessively rough surface on root pass;
6. Unconsumed bevel edge at root;
7. Temporary attachment weld bead remnant and grinding on flange surfaces;
8. Missing pipe / incomplete skid;
9. The Skids failed to pass visual welding inspection;

The above defects and welding are such that the Skids will require significant field fabrication. That field fabrication will require that Black Bear expend significant sums of money, time, and manpower, all of which it will offset against the price for the Skids. Moreover, any charges against Black Bear caused by reasonable delay in said field fabrication will also be charged to you by way of an offset. Should that offset exceed the contract price for the Skids, Black Bear will look to you to repay such extra charges.

(ECF No. 241-3 at 18.)

## The Instant Litigation

On January 13, 2015, Black Bear filed the complaint that initiated this case. (MCCSMF (ECF No. 87) ¶ 87.) On the same day, Kovavic emailed Pelini acknowledging his receipt of a text message from Pelini and proposing a meeting time. (Id. ¶ 88.) Pelini accepted the meeting. (Id.) Pelini was served with the complaint in this case when he arrived for the meeting with Kovacic. (Id. ¶ 89a.)[23]

On January 15, 2015, litigation counsel for YPS sent counsel for Black Bear a "litigation hold" and inspection request letter. (Id. ¶ 90a.) On the next day, counsel for YPS sent a second "litigation hold" letter to Black Bear requesting immediate access to the skids. (Id. ¶ 89b.) On January 21, 2015, representatives from YPS were given access to the off-site location where YPS's skids were "purportedly" taken. (Id. ¶ 90b.)

## YPS' Inspection of the Materials in Black Bear's Scrapyard

---

[23] The MCCSMF has two paragraphs numbered "89" and two paragraphs numbered "90." (MCCSMF (ECF No. 270) ¶ 89a—90b.) The court in this Factual Background identified the first paragraphs numbered 89 and 90 as "89a" and "90a" and the second paragraphs numbered 89 and 90 as "89b" and "90b."

On at least two separate occasions, YPS inspected materials in Black Bear's scrapyard. (MCCSMF (ECF No. 270) ¶ 18.) Pelini, Canter, and Roy Leonard went to the Black Bear facility to inspect the salvage material. (ECF No. 237-4 at 29.) YPS' expert, Govan Engineering, inspected "[f]abrication materials located in the yard of Black Bear" and concluded that "it is not possible to link the 'piping spools' or any other remnants visually inspected…to the material used by YPS in the Skids." (ECF No. 237-4 at 50-51.) Govan Engineering opined: "If any of the material in Black Bear's yard is from the Skids, the majority of the welds visually inspected…had acceptable surface profiles and passed the visual weld inspection." (Id. at 52.)

### Facts with respect to YPS' Spoliation Claim

According to YPS, "there is no genuine issue of material fact whether the Skids were demolished" based upon YPS' exhibit 39. (MCCSMF (ECF No. 270) ¶ 104.) Exhibit 39 describes photographs taken by YPS:

> YPS documented its fabrication of the Skids and Platforms in late 2014/early 2015, together with its inspection of the Skids on January 21, 2015 after possession of the Skids had been turned over to MarkWest, in a series of 755 photos (the "PhotoSeries"). The Photo Series was produced in .pdf format to Black Bear in 2015 and then to Black Bear and MarkWest in 2018. The last 58 photos in the Photo Series, photos 697 through 755 of the .pdf document, were taken by YPS when it inspected the Skids while the Skids were in MarkWest's possession on January 21, 2015 (the "Inspection Photos"). This document contains 18 representative photos from the Inspection Photos.

> NOTE: It is YPS's "best guess"…[that] the photos in this document are photos of the replacement skids as these replacement skids were being fabricated. YPS makes that assumption on the basis that, as can be seen in the photos of the Skids taken by YPS during fabrication (YPS App. Ex. 56), YPS painted the Skids "MarkWest Gray." The steel in the attached photos has not been painted.

(ECF No. 261-15 at 1.)

### MarkWest's Training and Supervision of Loosli

YPS' negligent training and supervision claim is based upon MarkWest's training and supervision of Loosli. (MCCSMF (ECF No. 270) ¶ 40.) Loosli was employed by MarkWest

Hyrodcarbon, Inc., which became known as MarkWest Hydrocarbon, L.L.C. (ECF No. 237-1 at 45-46.) Loosli is a certified welding inspector and testified that he has "expertise" in "overall construction, design, engineering of almost all gas facilities." (ECF No. 237-3 at 12.)

Loosli had a responsibility to oversee contractors' work, which required at least weekly visits to job sites to "see the progress." (ECF No. 261-8 at 5-6.) Loosli was also responsible for inspecting completed work. (Id.) Loosli documented his inspections in writing via a "punch list[,]" which set forth items to be corrected or fixed. (Id. at 5-6.) Loosli would send the punch list and any photographs he took to the contractor. (Id. at 6-7.)

Greco testified that Loosli asked Black Bear for a $40,000.00 "gift." (MCCSMF (ECF No. 270) ¶ 51.) Black Bear told Loosli "it could not be done, would not be done to the point where…[Black Bear] thought…[it was] going to lose the opportunity." (Id.) At the end of November 2014, Kovacic, Loosli, and their families traveled to Orlando, Florida to go to Disney World. (ECF No. 261-4 at 30-31.) The trips were paid for by Black Bear. (Id. at 32.)

**MarkWest Ethics Report with respect to Loosli**

MarkWest during discovery in this case produced an EthicsPoint Report #70 dated December 18, 2014 (the "Ethics Report"). (MCCSMF (ECF No. 270) ¶ 54.) The Ethics Report was authored by Mack and described ethics violations by Loosli, including allegations, among others, that Loosli disclosed confidential information, obtained positions for his family members, overlooked errors, intended to sell company material for personal profit, and received "gifts" from contractors. (Id.; ECF No. 261-8 at 24-27.) The Ethics Report was accessible to, among others, Andrew Morrison ("Morrison"), who worked in human resources for MarkWest, and Cory Bromley ("Bromley"), who worked in MarkWest's legal department. (Id.)

On December 18, 2014, Bromley and Morrison each viewed the report. (Id.) In the Ethics Report, Mack wrote that the issues raised in the report were brought to the attention of "upper

management…but no further action was taken." (Id.; ECF No. 261-13 at 5.) It was Mack's "[o]pinion" that the matter was "swept under the rug." (ECF No. 261-13 at 5.) The report provides that "MarkWest management has initiated an investigation of the issues raised in this report" and that the author, i.e., Mack, should contact Morrison with additional information. (Id. at 5-6.)

Mack testified as follows with respect to the Ethics Report in his disposition:

I had brought [Loosli's conduct]…to his superior beforehand, and he said that he would take care of it and look into it. After about three months and nothing had changed, there was another incident where Dennis had arranged to take materials from MarkWest and sell it for himself. He called it the Dennis Loosli Foundation and his Christmas bonus, and at that point I had realized that his upper management was just as interested as he was into doing the things he was doing so I launched a complaint directly to MarkWest Denver and went to their ethics site.

(ECF No. 261-8 at 26.)

On December 31, 2014, Rick Ferguson, mechanical manager for MarkWest, sent an email to David Crawford ("Crawford"), another employee of MarkWest, with a subject line of "Humphreys Compressor Station[.]" (MCCSMF (ECF No. 270) ¶ 55.) Ferguson in the email wrote about the "lack of experience and leadership from site inspectors and site managers." (Id.) He explained:

As we spoke on the phone my concerns with Dennis and his construction team, this is my opinion.

Humphreys station is at least 2 months late for startup and over budget. This is due to lack of experience and leadership from site inspectors and site manager.

The onsite inspectors are his son and son-in-law.
The contractors run the job not the inspectors.
Site manager and inspectors not giving truthful update to his leadership and operation. Facility has a lot of non-preferred equipment, site manager decided to change to more expensive equipment without contacting operations, engineering, or management. This added extra cost and time to the project.

Construction personnel were threatened, were not allowed to share information with operation about short cuts in wiring installation, incomplete heat trace, insulation and equipment assembly issues.

Operation has supplied 5 different punch lists to construction for incomplete construction items without a response from site inspectors or site manager until the 11th hour. Site inspectors supplied false information about completed punch list, once verified critical items not completed.

Incoming equipment not inspected on arrival and marked as complete, equipment not built per P&ID and also missing valves and many components. This also added extra cost and time to project.

Dennis was notified August 28th (approximately) that contact glycol contactor was installed 180° out by vendor, site manager opted to modify piping instead of correcting issue, which also added extra cost and time to project.

Dennis will not take responsibility to mistakes in construction and always blames someone else for his lack of leadership.

The poor workmanship on this site is not up to Markwest [sic] standards, our customers expect a compressor station that is safe and reliable to process their gas.

Operation feels we cannot trust Dennis Loosli and his team, we have had many issues that have resulted in delaying project start time and over spending budget.

To date most all punch list item have been completed and we feel this station will be safe for our employees and reliable for our customers, we have really struggled as a team to keep the onsite management group in check.

(ECF No. 261-13 at 7.) Crawford forwarded the foregoing email to Gene Ferraro. (Id.)

Gary Borhman ("Borham") was Loosli's direct supervisor. (Id. ¶ 58.) Borham regularly met with Loosli. (Id.) At no point from October 2014 through December 2014 was Loosli informed that someone complained about his conduct as a MarkWest employee. (Id. ¶ 59.)

On January 8 and 9, 2015, a third-party investigator conducted interviews of MarkWest's Humphreys Site personnel. (MCCSMF (ECF No. 270) ¶ 57.)

## IV.    Standard of Review

In relevant part, Rule 56 provides:

A party may move for summary judgment, identifying each claim or defense...on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.
                                        ...
A party asserting that a fact cannot be or is genuinely disputed must support the assertion by...citing to particular parts of materials in the record...or...showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c). After discovery and upon a motion, Rule 56 requires the entry of summary judgment against a party who "'fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322–23)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts….Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

In deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001). The court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## V.    Discussion

### A.  YPS' Motion for Summary Judgment (ECF No. 239)

**1. Black Bear's Breach of Contract and Breach of Warranty Claims**

Black Bear in its counterclaims against YPS asserts, among other claims, a claim for breach of contract under Ohio law[24] and claims for breach of implied warranty of fitness for a particular purpose and breach of warranty of merchantability. (ECF No. 129 at 25-26.) Under Ohio law, a plaintiff must prove the following elements to succeed on a breach of contract claim:

(1) the existence of a contract;

(2) performance by the plaintiff;

(3) breach by the defendant; and

(4) damage or loss to the plaintiff.

Anadarko E & P Co. LP v. Northwood Energy Corp., 970 F. Supp. 2d 764, 769 (S.D. Ohio 2013) (citing Savedoff v. Access Group, Inc., 524 F.3d 754, 762 (6th Cir. 2008)). With respect to proving the existence of a contract, "[t]he essential elements of contract formation are an offer, acceptance, contractual capacity, consideration, manifestation of mutual assent, and legality of object and of consideration." Bruzzese v. Chesapeake Expl., LLC, 998 F. Supp. 2d 663, 669 (S.D. Ohio 2014).

With respect to the breach of warranty of fitness for a particular purpose, OHIO. REV. CODE § 1302.28 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose.

Id. To succeed on a claim for breach of implied warranty of fitness for a particular purpose, a plaintiff must prove:

(1) that the seller knew of the buyer's particular purpose,

---

[24]     All parties agree that Ohio law governs the substantive legal issues in this case. (ECF No. 234 at 4 n.3.)

(2) that the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish or select the appropriate goods, and

(3) that the buyer relied upon the seller's skill or judgment.

Norcold, Inc. v. Gateway Supply Co., 604, 798 N.E.2d 618, 626 (Ohio Ct. App. 2003). "Additionally, the buyer's expertise or potentially superior knowledge with regard to the goods sold is a relevant factor to weigh into the reliance analysis." Id. With respect to the warranty of merchantability, OHIO REV. CODE § 1302.27(A) provides:

(A) Unless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

Id. To show a defendant breached the implied warranty of merchantability, a plaintiff must prove that goods sold "are not of an acceptable quality when compared to that generally acceptable in the trade of goods of that kind." Norcold, 798 N.E.2d at 625.

YPS in its motion for summary judgment argues that "[n]o acceptance of the Skids ever occurred" by Black Bear under OHIO REV. CODE § 1302.64, and, therefore, Black Bear is not entitled to recovery based upon YPS' alleged breach of contract or warranties under OHIO REV. CODE §§ 1302.88, 1302.89. (ECF No. 239 at 10.) YPS also argues that Black Bear failed to give YPS reasonable and timely notice that YPS breached the contract, and, therefore, Black Bear not entitled to recovery under section 1302.88(A). (Id. at 4.) In response, Black Bear argues that it is seeking recovery from YPS under section 1302.85(A), which provides for a seller's remedy of "cover." (ECF No. 243 at 6.) According to Black Bear, it is entitled to recovery from YPS whether it "'rightfully reject[ed] or justifiably revoke[d] acceptance.'" (Id. (quoting Ohio Rev. Code Ann. § 1302.85(A)). Black Bear also argues that it provided YPS reasonable and timely notice of YPS' breach of contract. (Id. at 4-5.) The court will analyze the evidence of record to

determine whether a reasonable jury could find in favor of Black Bear with respect to its claim against YPS for breach of contract.

"In Ohio, the Uniform Commercial Code, as codified by the Ohio Commercial Code, governs contracts for the sale of goods." Energy Mktg. Servs., Inc. v. Homer Laughlin China Co., 186 F.R.D. 369, 374 (S.D. Ohio 1999), aff'd, 229 F.3d 1151 (6th Cir. 2000). The platforms and skids at issue in this case are "goods" as defined by OHIO REV. CODE § 1302.01(8). The contracts at issue must, therefore, be analyzed under the principles set forth in the Ohio Commercial Code ("OCC"). See Energy Mktg., 186 F.R.D. at 374. The court will consider the relevant portions of the OCC to determine whether there is evidence of record sufficient for a reasonable jury to find that Black Bear rightfully rejected the skids, and, therefore, is entitled to the remedy of "cover."

Pursuant to section 1302.60:

[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

(A) reject the whole; or

(B) accept the whole; or

(C) accept any commercial unit or units and reject the rest.

Ohio Rev. Code § 1302.60. Here, there is evidence of record for a reasonable jury to find that the skids did not conform to YPS' contract with Black Bear, e.g., there is evidence that YPS agreed to manufacture skids that conformed to MarkWest standards, and, according to MarkWest, the skids produced by YPS did not conform to MarkWest standards because, among other reasons, they were not welded by MarkWest-certified welders and YPS did not use MarkWest valves on the skids. Even if YPS breached the contract, YPS argues that a reasonable jury could not find that Black Bear rightfully rejected the skids under the OCC.

Pursuant to section 1302.61, the "[r]ejection of goods must be within a reasonable time after their delivery or tender…[and] is ineffective unless the buyer seasonably notifies the seller." "Notice need not be in any particular form and may be implied from conduct." Kabco Equip. Specialists v. Budgetel, Inc., 2 Ohio App. 3d 58, 61, 440 N.E.2d 611, 614 (1981). "The determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact." Id.

If a good is rightfully rejected *or* acceptance is justifiably revoked, then under section 1302.85, a buyer has the right to "cover.". The OCC provides the following about the remedy of "cover:"

> (A) After a breach within the preceding section, the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

> (B) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in section 1302.89 of the Revised Code, but less expenses saved in consequence of the seller's breach.

> (C) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

OHIO REV. CODE § 1302.86.

Here, there are material disputes of fact about *when* Black Bear informed YPS that it rejected each skid and whether the notice it provided YPS was sufficient to constitute a rightful rejection under the OCC. Black Bear adduced the following evidence of record to show that it reasonably and timely notified YPS that it rejected the skids:

- in December 2014, Nicolozakes Trucking began to deliver the skids from YPS to MarkWest;

- on December 17, 2014, Greco forwarded to Canter (and others) the email he received from Loosli that detailed at least three issues with the inlet separator skid, which was the first of the four skids delivered to MarkWest;

34

- at first, Payne provided YPS the opportunity to make the repairs to the skids, but on December 19, 2014, Payne sent Canter an email informing him that Black Bear would be taking over the repairs to the inlet separator skid, i.e., the first skid received by MarkWest;

- on December 31, 2014, after a meeting between YPS, Black Bear, and JanX, and an inspection of the second and third header skids performed by JanX, Canter told Pelini that that the inspection did not go well and Pelini instructed Canter to shut down the YPS plant because it was not going to do any more work on the skids;

- on January 2, 2015, Pelini went to the Humphreys Site and met with Collins and Payne to inspect the inlet separator skid and the first header skid, and it was explained to Pelini that the skids were deficient because his welders were required to be "MarkWest-certified" and that the wrong valves were used on the skids; and

- according to YPS, Black Bear's "rework" of the skids began—at the latest—on January 7, 2015.

Based upon the foregoing evidence, a reasonable jury viewing the evidence in the light most favorable to Black Bear could find that: by December 17, 2014, Black Bear communicated to YPS that the inlet separator skid did not conform to its expectations under the contract; Black Bear continued to communicate various issues with the skids to YPS; on December 31, 2014, Pelini shut down production on the skids after the skid inspection by Payne and Collins; and on January 2, 2015, Payne and Collins identified additional large-scale deficiencies with the skids. A reasonable jury could, therefore, find that Black Bear—even if it did not accept the skids— rightfully rejected the skids in a reasonable and timely manner and communicated the rejection to YPS. If a reasonable jury found that Black Bear rightfully rejected the skids, it could, therefore, find that Black Bear is entitled to the remedy of cover provided for in the OCC. Under those circumstances, to the extent Black Bear purchased replacement parts to rework the skids, it may be entitled to damages for exercising its alleged right to "cover" under section 1302.85.

YPS' motion for summary judgment will, therefore, be denied with respect to Black Bear's breach of contract claims.[25]

## 2. YPS' Claim that Black Bear Fraudulently Concealed Facts to Get Skids out of YPS' Possession

The court in Laber v. United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, 126 F. Supp. 3d 934 (N.D. Ohio 2015), explained:

> Under Ohio law, the elements of fraudulent misrepresentation are: "(1) a representation or, when there is a duty to disclose, a concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance." Stuckey v. Online Resources Corp., 819 F.Supp.2d 673, 682 (S.D.Ohio 2011) (citing Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 700 N.E.2d 859, 868 (1998)).

Id. at 943. Under Ohio law, "[t]he elements of fraud must be established by clear and convincing evidence[,]" i.e., the "measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." Rapport v. Kochovski, 313, 923 N.E.2d 1212, 1215 (Ohio Ct. App. 2009).

YPS argues that the undisputed evidence of fact shows that Black Bear fraudulently concealed the following material facts from YPS to convince YPS to provide the second and third header skids to Black Bear:

(1) YPS would not be completing work on the skids;

(2) the first two skids delivered by YPS would be taken from the Humphreys site to a rented warehouse where they would be demolished;

---

[25]    Because Black Bear adduced sufficient evidence of record to show that it is entitled to the remedy of cover under the OCC, the court need not address whether the evidence of record is sufficient for a reasonable jury to find that Black Bear accepted the skids and is entitled to damages under section 1302.88 or 1302.89.

(3) the second and third header skids would not be delivered to the Humphreys
Site and would be taken to Black Bear's Barnesville facility where they would
be demolished; and

(4) Black Bear instructed Nicolozakes Trucking to take the second and third
header skids to Black Bear's Barnesville facility instead of the Humphreys
Site.

(ECF No. 239 at 12.) According to YPS, it relied upon the foregoing omissions "to move up the

shipping date and allow Black Bear to take the final two Skids without collecting payment in full

only because the Skids were not complete." (Id.)

A review of the evidence adduced in this case, however, shows that YPS is not entitled to

summary judgment with respect to its fraudulent concealment claim. There is evidence of record

that:

- Black Bear told YPS that the second and third header skids would not pass visual
inspection because, among other problems, they did not have "brother-in-law welds[,]"
the welders were not MarkWest-certified, and there were issues with the valves, (ECF
No. 245-1 at 79);

- YPS knew the second header skid was complete, but the third header skid was not;

- YPS informed Loosli that the last two header skids were not finished, and Loosli
instructed YPS to ship the unfinished header skids, (ECF No. 261-6 at 23);

- Pelini was told that Black Bear would complete the skids when they arrived at the
Humphreys Site, (ECF No. 261-4 at 20); and

- YPS permitted Nicolozakes Trucking to take the second and third header skids from its
possession to deliver them to Black Bear, (ECF No. 245-1 at 81); and

- Black Bear at the Barnesville facility performed work on the YPS skids to bring them in
conformity with MarkWest's standards.

A reasonable jury could, therefore, find that YPS permitted the second and third header skids to

be shipped to Black Bear without full payment despite knowing the third header skid was

unfinished, both skids had problems according to MarkWest and Black Bear and would not pass

a visual inspection by MarkWest, and that Black Bear was going to perform work on the second

and third header skids. Under those circumstances, a reasonable jury could find that Black Bear's

alleged concealment of the facts set forth by YPS was not the proximate cause of YPS' alleged damages because YPS permitted the skids to be shipped to Black Bear despite knowing that Black Bear intended to perform work on the skids to finish them and alter them to bring them into compliance with MarkWest standards. YPS' motion for summary judgment with respect to this claim will, therefore, be denied because Black Bear adduced evidence sufficient to show—at the very least—material disputes of fact exist with respect to this claim.

### B. MarkWest's Motion for Summary Judgment (ECF No. 230)

YPS asserts ten claims against MarkWest. (ECF No. 79.) MarkWest argues it is entitled to judgment as a matter of law on eight of those ten claims. Each of those eight claims, the parties' arguments, and the applicable law will be addressed below.

### 1. Spoliation (Count III)

Under Ohio law, a claim for spoliation or "interference with or destruction of evidence" has five elements:

(1) pending or probable litigation involving the plaintiff,

(2) knowledge on the part of defendant that litigation exists or is probable,

(3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case,

(4) disruption of the plaintiff's case, and

(5) damages proximately caused by the defendant's acts….

Smith v. Howard Johnson Co., 615 N.E.2d 1037, 1038 (Ohio 1993). With respect to the third and fourth elements, one court has explained: "A party alleging a spoliation claim must set forth evidence showing willful destruction evidence designed to disrupt the party's case." Wheatley v. Marietta Coll., 48 N.E.3d 587, 621 (Ohio Ct. App. 2016). "[M]ere destruction of evidence does not lead to natural conclusion that evidence was willfully destroyed and…a party's speculation that evidence was willfully destroyed is not sufficient to prevent summary judgment; instead,

[the] party must produce evidence." Id. (citing Sutliff v. Cleveland Clinic Found., No. 91337, 2009 WL 205863, at ¶ 33 (Ohio Ct. App. Jan. 29, 2009). "Furthermore, to show that willfully destroyed evidence disrupted the plaintiff's case, the plaintiff must prove 'that the evidence which was destroyed was of such a nature that it would have enabled the plaintiff successfully to purse the * * * civil action.'" Id. (quoting Tomas v. Nationwide Mut. Ins. Co., 607 N.E.2d 944, 948 (Ohio Ct. App. 1992)). In other words, "speculation that willfully destroyed evidence would have helped the plaintiff's case is insufficient." Id. (citing Tomas, 607 N.E.2d at 950).

YPS' spoliation claim is based upon allegations that MarkWest committed spoliation by willfully and maliciously destroying the skids at issue in this case. (ECF No. 246 at 4-6.) MarkWest argues in its brief in support of its motion for summary judgment that YPS did not adduce evidence sufficient for a reasonable jury to find in YPS' favor with respect to spoliation because there is no evidence of record that *MarkWest* (as opposed to another entity) destroyed the skids; rather, the undisputed evidence of record shows that the second and third header skids were picked up from YPS by Nicolozakes Trucking and delivered to the Barnesville facility, where Black Bear repaired the skids. (ECF No. 231 at 5-7.) MarkWest also argues that YPS failed to adduce evidence to show that the skids were destroyed to disrupt YPS' case or that YPS' case was in fact disrupted as a result of the alleged destruction of the skids. (ECF No. 265at 2-3.) YPS argues in response that MarkWest should be held liable for destroying the skids because "MarkWest, through Loosli, and Black Bear, by assigning Black Bear employee Pam Payne as project manager to the offsite location of the Skids, kept the Skids concealed from YPS until the Skids were destroyed." (ECF No. 246 at 4.) The court will consider the evidence of record and the arguments presented by MarkWest and YPS to determine whether MarkWest is entitled to summary judgment on this claim.

MarkWest argues that there is no evidence that *MarkWest*—as opposed to another party or entity—destroyed the skids, and, therefore, it is entitled to summary judgment with respect to this claim. Under Ohio law, however, a defendant may be held liable for the destruction of evidence if the defendant had "access to or control of" the evidence. Scheel v. Rock Ohio Caesars Cleveland, L.L.C., 108 N.E.3d 1252, 1266 (Ohio Ct. App. 2018). There is evidence presented in this case that MarkWest had access to and control of the skids. For example, MarkWest *permitted* Black Bear to conduct the repairs on the skids and Black Bear performed the rework near Loosli's office to permit daily inspections of the rework by MarkWest; indeed, someone from MarkWest oversaw the MarkWest-certification of the Black Bear welders. Under those circumstances, a reasonable jury could find that MarkWest had access to and control of the skids.

MarkWest also argues that there is no evidence that it *willfully destroyed the skids to disrupt YPS' case*; rather, Black Bear reworked the skids for MarkWest so that the skids could be used at the Humphreys Site in a timely manner to avoid penalties from McCarl's. To the extent YPS' spoliation claim is based upon Black Bear's use of the the skids produced by YPS, a reasonable jury could find that Black Bear had a statutory right to reasonable use of the nonconforming skids produced by YPS. Under the OCC, a buyer may continue to reasonably use nonconforming goods that the buyer rejected without accepting the goods. In McCullough v. Bill Swad Chrysler-Plymouth, 449 N.E.2d 1289 (Ohio 1983), the issue of first impression before the court was: "Whether appellee, by continuing to operate the vehicle she had purchased from appellant after notifying the latter of her intent to rescind…the purchase agreement, waived her right to revoke her initial acceptance." Id. at 1292. The court explained that the answer to the question depended upon whether the continued use of the vehicle was "reasonable[,]" which was a question to be answered by the trier of fact. Id. The court recognized that:

> [F]requently a buyer, after revoking his earlier acceptance of a good, is constrained by exogenous circumstances, many of which the seller controls—to continue using the good until a suitable replacement may realistically be secured…[and] [t]o penalize a buyer for a predicament not of his own creation would be patently unjust.

Id. The court set forth five factors for the court to consider to determine whether the continued use of a good—after revocation of acceptance—was reasonable:

> (1)     Upon being apprised of the buyer's revocation of his acceptance, what instructions, if any, did the seller tender the buyer concerning return of the now rejected goods?

> (2)     Did the buyer's business needs or personal circumstances compel the continued use?

> (3)     During the period of such use, did the seller persist in assuring the buyer that all nonconformities would be cured or that provisions would otherwise be made to recompense the latter for the dissatisfaction and inconvenience which the defects caused him?

> (4)     Did the seller act in good faith?

> (5)     Was the seller unduly prejudiced by the buyer's continued use?

McCullough, 449 N.E.2d at 1293. After consideration of the foregoing questions, the court held that the buyer's continued use of the vehicle was reasonable because, among other reasons, she was "a young clerical secretary of limited financial resources…scarcely in the position to return the defective automobile and obtain a second in order to meet her business and personal needs" and the seller failed to take possession of the vehicle after the buyer's initial revocation of acceptance. Id. Under those circumstances, the court found that the seller "must bear the loss for any diminution of the vehicle's resale value." Id.

Importantly to this case, the reasonable use test set forth in McCullough was applied by the Ohio Court of Appeals in a case in which the trial court found the buyer initially rejected the goods but continued to use them. George v. Fannin, 588 N.E.2d 195, 199 (Ohio Ct. App. 1990). In George, the court held that the continued use of the allegedly defective goods, i.e., draperies,

was not reasonable because the continued use lasted more than a year without any alteration to the goods despite the goods' alleged nonconformities with the parties' contract terms. Id. Based upon the foregoing, under Ohio law, a buyer may continue to use nonconforming goods without revoking its rejection of the goods so long as the use is "reasonable" based upon the considerations set forth by the Ohio Supreme Court in McCullough.

Here, (as discussed above) a reasonable jury could find that Black Bear rejected all four skids but continued to possess and use them by dismantling the skids and reusing some of their parts to construct skids that complied with MarkWest's standards. Based upon the time constraints placed on Black Bear by MarkWest to avoid additional charges from McCarl's, a reasonable jury could find that Black Bear's use of the YPS skids to rebuild conforming skids was reasonable and did not constitute acceptance of the skids. Under those circumstances, a reasonable jury could find that the YPS skids were not destroyed; rather, they were reworked to comply with MarkWest standards within Black Bear's rights under Ohio law.

On the other hand, however, a reasonable jury could find that Black Bear did not reject the YPS skids until its counsel provided the letter to YPS on January 12, 2015, which was after Black Bear began to rework and take apart the skids. Evidence of record shows that MarkWest instructed Black Bear to not inform YPS that MarkWest did not want YPS involved in the reparation work to the skids; indeed, Black Bear diverted the delivery of the second and third header skids to its Barnesville facility without telling YPS that the skids would not be delivered to the Humphreys Site. A reasonable jury could, therefore, conclude that Black Bear's dismantling of the skids—with MarkWest's oversight—before YPS was informed that the skids were rejected shows that the skids were intentionally destroyed by Black Bear to prohibit YPS from exercising any right to cure the nonconformities under section 1302.52, which provides a

seller the right to cure if the "time for performance has not yet expired." OHIO REV. CODE §
1302.52(A).

Based upon the foregoing, material disputes of fact exist about whether MarkWest
intentionally had Black Bear destroy the skids to disrupt YPS' case. MarkWest's motion for
summary judgment on this claim will, therefore, be denied.

### 2. Tortious Interference with Contract (Count IV)

The elements of tortious interference with a contract are:

(1) the existence of a contract,

(2) the wrongdoer's knowledge of the contract,

(3) the wrongdoer's intentional procurement of the contract's breach,

(4) the lack of justification, and

(5) resulting damages.

Fred Siegel Co., L.P.A. v. Arter & Hadden, 707 N.E.2d 853, 858 (Ohio 1999). The court in Fred

Siegel explained:

> Only improper interference with a contract is actionable, as reflected in the fourth
> element of the tort as set forth in the Kenty syllabus. Thus, even if an actor's
> interference with another's contract causes damages to be suffered, that
> interference does not constitute a tort if the interference is justified. "The issue in
> each case is whether the interference is improper or not under the circumstances;
> whether, upon a consideration of the relative significance of the factors involved,
> the conduct should be permitted without liability, despite its effect of harm to
> another." 4 Restatement of the Law 2d, Torts, at 28, Section 767, Comment b. We
> today reaffirm Kenty and hold that establishment of the fourth element of the tort
> of tortious interference with contract, lack of justification, requires proof that the
> defendant's interference with another's contract was improper.

Id.

Evidence of record shows that (1) a contract existed between YPS and Black Bear, and

(2) MarkWest, the alleged wrongdoer, knew about the contract between YPS and Black Bear.

MarkWest argues, however, that YPS failed to adduce evidence of record upon which a

reasonable jury could find that MarkWest procured the breach of the contract between YPS and Black Bear (element three) or that MarkWest's actions were not justified (element 4). According to YPS, Loosli (acting for MarkWest) intended to secure the breach of Black Bear's contract with YPS (element three) by "requiring Black Bear to get YPS out of the Skid project as a condition to Black Bear's own ability to continue work on the Skids and that…Loosli enforced …[the] demand by threatening Black Bear with losing MarkWest's business and 'millions' in penalties." (ECF No. 246 at 7.)

The undisputed evidence of record shows that MarkWest—with knowledge that Black Bear subcontracted the skid-work to YPS and that Black Bear wanted to save its name and continue to work with MarkWest—instructed Black Bear that YPS was not to be involved in the reparation work on the skids. As discussed above, a reasonable jury could find that Black Bear in compliance with MarkWest's instructions to keep YPS out of the reparation work, intentionally delayed its rejection of all four skids until January 12, 2015, i.e., after it began to dismantle and reconstruct skids that complied with MarkWest standards, to prevent YPS from exercising any right it had to cure the skids' nonconformities. Under those circumstances, a reasonable jury could find that MarkWest intentionally procured the breach of the contractual agreement between Black Bear and YPS.

Material disputes of fact also exist with respect to whether MarkWest's conduct was justified. The court in Columbia Development Corporation v. Krohn, No. C1300842, 2014 WL 7277755 (Ohio App. Ct. Dec. 19, 2014), explained:

> "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

Id. ¶ 26 (quoting Restatement (Second) of Torts § 773 (1979)). A reasonable jury could find that MarkWest in good faith was concerned with whether YPS could repair the skids in an acceptable and timely manner that would preclude additional charges from McCarl's. On the other hand, a reasonable jury could also find that because of MarkWest's concealment of the rework plans from YPS—despite YPS' willingness to meet and discuss the nonconformities in the skids—that MarkWest was not acting in good faith to protect its own interests. MarkWest does not otherwise argue that YPS failed to adduce evidence of fact of damage[26] to support this claim. Based upon the foregoing, there is sufficient evidence of record for a reasonable jury to find that MarkWest tortuously interfered with YPS' contract with Black Bear to procure its breach. MarkWest's motion for summary judgment will, therefore, be denied with respect to YPS' tortious interference with contractual relations claim.

### 3. Fraudulent Misrepresentation (Count V) and Fraudulent Concealment (Count VI)

As discussed above, under Ohio law, the elements of fraudulent misrepresentation (or concealment) are:

(1) a representation or, when there is a duty to disclose, a concealment of a fact;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred;

(4) with the intent of misleading another into relying upon it;

(5) justifiable reliance on the representation or concealment; and

(6) an injury proximately caused by that reliance.

Laber, 126 F.Supp. 3d at 943.

---

[26]     Summary judgment in favor of a defendant is inappropriate where "there exists no question as to the *fact of damages* but only a factual question as to the *amount of damages*…." Aircraft Guar. Corp. v. Strato-Lift, Inc., 991 F. Supp. 735, 743 (E.D. Pa. 1998) (emphasis added).

MarkWest argues that it is entitled to summary judgment on YPS' fraudulent misrepresentation and fraudulent concealment claims because: (1) MarkWest did not have a duty to disclose to YPS; (2) MarkWest's action did not cause YPS' damages; and (3) YPS did not rely upon MarkWest's allegedly false representations or concealment of fact. YPS disagrees with MarkWest's view of the facts in this case and argues MarkWest's motion for summary judgment with respect to these claims should be denied. Each issue raised by MarkWest will be addressed below.

Although it is not clear from the parties' summary judgment submissions, the court discerns that YPS' fraudulent misrepresentation and fraudulent concealment claims are based upon: (1) Loosli's statement to YPS that the second and third header skids would be delivered to the Humphreys Site; and (2) his omission that the second and third head skids would—in fact— be delivered to Black Bear's Barnesville facility. See (ECF No. 246 at 10.) MarkWest first argues that it is entitled to summary judgment with respect to the fraudulent concealment claim because there is no evidence of record to show that MarkWest had a duty to disclose the delivery location of the second and third header skids to YPS. MarkWest is correct that under Ohio law, "'in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other.'" Daly v. New York Life Ins. Co., No. 1:12CV125, 2019 WL 4751706, at *4 (S.D. Ohio Sept. 30, 2019) (quoting Blon v. Bank One, Akron, N.A., 519 N.E.2d 363, 367 (Ohio 1988)). Ohio law also provides, however, that "[f]ull disclosure may…be required of a party to a business transaction 'where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.'" Blon, 519 N.E.2d at 367 (quoting Connelly v. Balkwill, 174 F. Supp. 49, 58 (N.D. Ohio 1959), aff'd, 279 F.2d 685 (6th Cir. 1960)). A reasonable jury may, therefore,

find that because Loosli told YPS that the second and third header skids would be delivered to the Humphrey Site, he was required to disclose to YPS the truth, i.e., that the skids would be delivered to Black Bear's Barnesville facility.

MarkWest next argues that the undisputed evidence of record shows that—as a matter of law—Loosli's allegedly false representation and omission about the location to which the second and third header skids would be delivered were not the proximate cause of YPS' damages. The Ohio Supreme Court has defined proximate cause as follows:

> "[W]here an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability."

Aetna Cas. & Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 543 (6th Cir. 2000) (quoting Clinger v. Duncan, 166 Ohio St. 216, 141 N.E.2d 156, 162 (1957)). In other words, "[t]here is no damage where the complaining party is no worse off than it would have been had the alleged fraud not been committed." Columbia Gas Transmission Corp. v. Ogle, 51 F. Supp. 2d 866, 877 (S.D. Ohio 1997), aff'd, 172 F.3d 47 (6th Cir. 1998).

Based upon the evidence of record, YPS' damages appear to be based upon Black Bear's failure to pay YPS the full contract price for the platforms and skids. YPS, however, did not adduce evidence sufficient to show that Black Bear would have paid YPS the full contract price for the platform and skids if Loosli did not misrepresent the delivery location of the skids. Black Bear informed YPS about the alleged deficiencies in the skids before they shipped to the Barnesville facility, and Black Bear informed YPS that work would be performed on the skids. There was no evidence presented upon which a reasonable jury may infer that Black Bear would have paid YPS the full contract price for the skids if Loosli told YPS that the second and third header skids were going to be delivered to the Barnesville facility. Under those circumstances, YPS failed to adduce sufficient evidence for a reasonable jury to find that MarkWest's fraudulent

misrepresentation or concealment was the proximate cause of YPS' injuries, i.e., YPS would have been "better off" if MarkWest had not committed fraud. MarkWest is, therefore, entitled to summary judgment with respect to YPS' claims for fraudulent misrepresentation and fraudulent concealment.

### 4. Unjust Enrichment (Count VIII)

The elements of a claim for unjust enrichment are:

1) the plaintiff conferred a benefit upon the defendant,

(2) the defendant had knowledge of such benefit, and

(3) the defendant retained that benefit under circumstances in which it would be unjust for him or her to retain that benefit.

Cleveland Cent. Catholic High Sch. v. Mills, 125 N.E.3d 328, 339 (Ohio Ct. App. 2018) (quoting Johnson v. Microsfot Corp., 834 N.E.2d 791, 799 (Ohio 2005)). "Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" Cleveland Cent, 125 N.E.3d at 339 (quoting Johnson, 834 N.E.2d at 799). "The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he or she has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it." Id. (citing Johnson, 834 N.E.2d at 799).

Under Ohio law, "a subcontractor must look to his contractor for payment, but a subcontractor may pursue an unjust enrichment claim against a homeowner when the original contractor is unavailable for judgment." Graves Lumber Co. v. Croft, 20 N.E.3d 412, 427 (Ohio Ct. App. 2014) (citing Apostolos Grp., Inc. v. Josephson, No. 20733, 2002 WL 242111, at *1 (Ohio Ct. App. Feb. 20, 2002)). Under those circumstances, YPS must show that Black Bear is unavailable for judgment in order to assert an unjust enrichment claim against MarkWest. YPS failed to adduce any evidence that Black Bear is unavailable for judgment in this case. Id. at 427

(finding the general contractor was unavailable for judgment because it filed for bankruptcy).

YPS' unjust enrichment claim against MarkWest is, therefore, untenable as a matter of law and MarkWest is entitled to summary judgment on the claim.[27]

### 5. Negligent Supervision (Count IX) and Negligent Training (Count X)

The court in <u>Sheldon v. Kettering Health Network</u>, 40 N.E.3d 661 (Ohio Ct. App. 2015), explained:

> The elements of a negligent supervision claim essentially are the same as those required to prove negligent hiring. <u>Browning v. Ohio State Hwy. Patrol</u>, 151 Ohio App.3d 798, 2003-Ohio-1108, 786 N.E.2d 94, ¶ 67 (10th Dist.).
>
> …
>
> They are: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining [or training or supervising] the employee as the proximate cause of plaintiff's injuries." <u>Evans v. Ohio State Univ.</u>, 112 Ohio App.3d 724, 739, 680 N.E.2d 161 (10th Dist.1996).

<u>Id.</u> at 678. One court has explained the "incompetence" element as follows:

> [I]ncompetence relates not only or exclusively to an employee's lack of ability to perform the tasks that his or her job involves. It also relates to behavior while on the job inapposite to the tasks that a job involves and which materially inhibits other employees from performing their assigned job tasks.

<u>Harmon v. GZK, Inc.</u>, No. 18672, 2002 WL 191598, at *17 (Ohio Ct. App. Feb. 8, 2002). The court offered sexual harassment as an example of "per se incompetent behavior." <u>Id.</u>

---

[27] Even if YPS could assert an unjust enrichment claim against MarkWest, YPS failed to adduce evidence to show that MarkWest attained any benefit from YPS under circumstances in which it would be unjust for MarkWest to retain that benefit. The undisputed evidence of record shows that MarkWest paid Black Bear the full contract price for the platforms and skids that MarkWest contracted Black Bear to provide. YPS did not point to any evidence of record to show that it provided MarkWest a benefit *beyond* the two platforms and four skids for which MarkWest paid Black Bear. Under those circumstances, a reasonable jury could not find that MarkWest was unjustly enriched by YPS and MarkWest would be entitled to summary judgment on the unjust enrichment claim. <u>See</u> <u>Moosehead Harvesting, Inc. v. Eureka Midstream, LLC</u>, No. 18 MO 0015, 2019 WL 474172, at *3 ¶ 14 (Ohio Ct. App. Sept. 30, 2019) (explaining that "when 'the owner has paid the general contractor in full for all performance rendered at the construction site, the owner has not received a benefit for which it has not paid. Consequently, the owner has not been unjustly enriched'") (quoting <u>Steel Quest, Inc. v. City Mark Const. Servs., Inc.</u>, No. C-960994, 1997 WL 674614, at *1 (Ohio Ct. App. Oct. 31, 1997)).

### i.    Negligent Supervision

Here, YPS' negligent supervision claim is based upon MarkWest's "failure to supervise…Loosli's performance of the basic responsibilities of a project manager when overseeing a contractor's performance." (ECF No. 246 at 17.) According to YPS, MarkWest's failure to supervise Loosli proximately caused Black Bear to violate the "the UCC's requirements for rejection and to preserve evidence during a dispute, prevented YPS…from inspecting the Skids and investigating MarkWest's claims that the Skids failed to conform with the contract…." (Id. at 17-18.) MarkWest argues, among other things, that it is entitled to summary judgment with respect to this claim because it is barred by Ohio's economic loss doctrine. (ECF No. 231 at 19-20.) YPS argues, however, that the claim is not barred because it seeks punitive damages. (ECF No. 246 at 18-20.)

The Supreme Court of Ohio has explained:

> The economic-loss rule generally prevents recovery in tort of damages for purely economic loss. See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co. (1989), 42 Ohio St.3d 40, 45, 537 N.E.2d 624; Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn. (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206. " '[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.' " Chemtrol, 42 Ohio St.3d at 44, 537 N.E.2d 624, quoting Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp. (Iowa 1984), 345 N.W.2d 124, 126. See, also, Floor Craft, 54 Ohio St.3d at 3, 560 N.E.2d 206. This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain free to govern their own affairs." Chemtrol, 42 Ohio St.3d at 42, 537 N.E.2d 624. See, also, Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting Sensenbrenner v. Rust, Orling & Neale Architects, Inc. (1988), 236 Va. 419, 425, 374 S.E.2d 55. " 'Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.' " Floor Craft, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting Sensenbrenner, 236 Va. at 425, 374 S.E.2d 55.

Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc., 414, 835 N.E.2d 701, 704 (Ohio 2005).

Generally, the economic loss rule will bar claims of negligent supervision where the plaintiff alleges the duty breached arises out of contract. <u>Thomas v. Deutsche Bank Nat. Tr. Co.</u>, No. 2:11-CV-866, 2012 WL 1854297, at *6 (S.D. Ohio May 21, 2012). An exception the general rule exists, however, if the plaintiff is seeking punitive damages. <u>Simpkins v. Grace Brethren Church of Delaware</u>, 16 N.E.3d 687, 710 (Ohio Ct. App. 2014). To prove entitlement to punitive damages, a plaintiff must prove malice. <u>Id.</u> "The Ohio Supreme Court defines malice for the purposes of punitive damages as, '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of another person that has a great probability of causing substantial harm.'" <u>Id.</u> (quoting <u>Preston v. Murty</u>, 512 N.E.2d 1174, 1175 (Ohio 1987)).

Here, YPS' allegations of wrongdoing against MarkWest and Loosli arise out of the duty imposed upon Black Bear under the terms of the contract between YPS and Black Bear. YPS argues that it was injured by MarkWest because it negligently supervised Loosli, which caused Black Bear to violate the "the UCC's requirements for rejection and to preserve evidence during a dispute, prevented YPS…from inspecting the Skids and investigating MarkWest's claims that the Skids failed to conform with the contract…." (ECF No. 246 at 17-18.) Under those circumstances, the economic loss rule would bar YPS' recovery of economic losses from MarkWest. YPS argues that it is seeking punitive damages based upon MarkWest's negligent supervision of Loosli. YPS, however, failed to adduce evidence sufficient for a reasonable jury to find that MarkWest acted with malice.

First, the record before the court is void of any evidence that MarkWest had any "hatred, ill will or a spirit of revenge" with respect to YPS. <u>Simpkins</u>, 16 N.E.3d at 710. Second, YPS failed to adduce evidence sufficient to show that MarkWest's alleged negligent supervision of

Loosli showed MarkWest's "conscious disregard for the rights and safety of…[YPS] that…[had] a great probability of causing substantial harm." Id. One court has explained:

> When actual malice is predicated on conscious disregard, such as is the case here, the court "must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm" and whether sufficient evidence was presented "that the party consciously disregarded the injured party's rights or safety." Id.; Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 446, 659 N.E.2d 1242.

Touhey v. Ed's Tree & Turf, L.L.C., 958 N.E.2d 212, 216–17 (Ohio Ct. App. 2011). In other words, the plaintiff must offer proof that the defendant "must have actually known of the threat" posed to the plaintiff. Malone v. Courtyard by Marriott L.P., 659 N.E.2d 1242, 1248 (Ohio 1996). "Absent such proof of a defendant's subjective knowledge of the danger posed to another, a punitive damages claim against that defendant premised on the "conscious disregard" theory of malice is not warranted." Id. "[P]unitive damages are intended to punish and deter conduct resulting from a mental state so callous in its disregard for the rights and safety of others that society deems it intolerable." Calmes v. Goodyear Tire & Rubber Co., 575 N.E.2d 416, 419 (Ohio 1991). "[M]isconduct greater than mere negligence is required." Id.

YPS relies upon the Ethics Report dated December 18, 2014, authored by Mack and a letter dated December 31, 2014, authored by Ferguson to show that MarkWest acted in conscious disregard for YPS' rights. The Ethics Report details alleged ethical violations by Loosli with respect to the Humphreys Site, including allegations, among others, that Loosli disclosed confidential information, obtained positions for his family members, overlooked errors, intended to sell company material for personal profit, and received gifts from contractors. According to Mack, he reported the foregoing allegations to Loosli's supervisor three months before he authored the Ethics Report. The Ethics Report provided that on the same day the report was submitted, MarkWest initiated an investigation of the allegations set forth in the report.

Ferguson in his email to Crawford explained that Loosli poorly managed the Humphreys Site, which caused a delay in the project and added costs to MarkWest, and that Ferguson did not trust Loosli. One week after Ferguson sent his email to Crawford, a third-party investigator conducted interviews of MarkWest's employees at the Humphreys Site. The records of the third-party investigation are privileged and not part of this litigation.

Based upon the foregoing, YPS did not adduce evidence sufficient to create a triable issue of fact about whether MarkWest acted in conscious disregard to YPS' rights. According to YPS, MarkWest's negligent supervision of Loosli caused Black Bear to violate its contractual obligations with YPS. The Ethics Report and Ferguson's email described allegations about Loosli's unethical management of the Humphreys Site, but did not provide sufficient information to MarkWest to provide it subjective knowledge that there was a great probability that Loosli would cause YPS substantial harm via Black Bear's alleged breach of its contractual obligations to YPS.

Even if a reasonable jury could find that the Ethics Report or Ferguson's email provided sufficient notice to MarkWest about Loosli's conduct, the undisputed evidence of record shows that on the day Mack submitted the Ethics report, MarkWest initiated an investigation of the allegations, and one week after Ferguson sent his email to Crawford, a third-party investigator conducted interviews of MarkWest employees at the Humphreys Site. Under those circumstances, a reasonable jury could not find that MarkWest acted in conscious disregard of the great probability that Loosli's conduct would cause substantial harm to YPS, i.e., Black Bear's alleged breach of its contractual duties.

Based upon the foregoing, YPS did not adduce evidence sufficient to create a triable issue of fact about its entitlement to punitive damages. Under the economic loss rule, YPS may not assert a negligent supervision claim against MarkWest for solely economic damages that

arise from Black Bear's alleged breach of contract. MarkWest is, therefore, entitled to summary judgment on YPS' claim for negligent supervision.

### ii.     Negligent Training

With respect to YPS' negligent training claim, YPS did not present any evidence about Loosli's training from any MarkWest entity or about training in the relevant industry that would support its claim for negligent training, i.e., YPS did not adduce evidence upon which a reasonable jury could find that a MarkWest entity was negligent in training Loosli, which proximately caused YPS' damages in this case. MarkWest is, therefore, entitled to summary judgment with respect to YPS' negligent supervision claim. See Matthews v. District of Columbia, 924 F.Supp.2d 115, 122 (D.D.C. 2013) (analyzing a negligent supervision claim under 42 U.S.C. § 1983 and granting summary judgment in favor of defendant because the plaintiff did not provide any "information about the training the…[defendant] offered").

### 6.  Civil Conspiracy (Count VII)

The court in In re National Century Financial Enterprises, Inc., Investment Litigation, 604 F. Supp. 2d 1128, 1153 (S.D. Ohio 2009), explained:

> A civil conspiracy is " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995) (quoting LeFort v. Century 21–Maitland Realty Co., 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645 (Ohio 1987)). The elements of a civil conspiracy claim are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." Universal Coach, Inc. v. New York City Transit Auth., Inc., 90 Ohio App.3d 284, 292, 629 N.E.2d 28, 33 (Ohio Ct.App.1993).

Id. at 1153. The "malicious combination" of a civil conspiracy claim requires proof of two or more entities "act[ing] in concert…to conjure up a scheme to purposefully and intentionally cause injury to…[the plaintiff]." Fifth Third Mortg. Co. v. Perry, No. 12CA13, 2013 WL 3946087, at *10 (Ohio Ct. App. July 24, 2013). Stated another way, "[t]he 'malice' in a

'malicious combination' involves a state of mind under which a person commits a wrongful act on purpose, without reasonable or lawful excuse, to the injury of another." Id. (citing Merchants Nat'l Bank v. Overstake, No. 11CA18, 2012 WL 6943868, at *2 (Ohio Ct. App. Dec. 31,2012)).

As explained in this opinion, YPS adduced evidence sufficient for a reasonable jury to find that MarkWest and Black Bear tortuously interfered with or destroyed the skids, which caused damage to YPS. There is evidence that MarkWest and Black Bear combined to destroy the skids, i.e., they agreed that Black Bear—under MarkWest's direction—would destroy or rework the skids to injure YPS, i.e., to prevent YPS from exercising its rights to cure the skids' alleged nonconformities. MarkWest oversaw Black Bear's work on the skids, MarkWest instructed Black Bear that YPS should not participate in the work of the skids, and Black Bear precluded YPS from participating in the rework of the skids. The unlawful act independent of the conspiracy is, if found by the jury, the intentional destruction of the skids to disrupt YPS' case. There are material issues of fact in dispute and a reasonable jury could, therefore, find that MarkWest and Black Bear conspired to destroy the skids to disrupt YPS' case. The motion for summary judgment with respect to this claim will, therefore, be denied.

### C. Black Bear and Kovacic's Motion for Summary Judgment (ECF No. 234)

### 1. Fraudulent Inducement to Contract (Count II) against Black Bear and Kovacic

The court in Barnes v. Reserve Energy Exploration, 68 N.E.3d 133 (Ohio Ct. App. 2016), explained:

> To successfully assert a prima facie case for fraudulent inducement, Appellants must establish: (1) a representation material to the transaction was made; (2) it was made falsely, with knowledge that it was false or with utter disregard or recklessness regarding whether it was false; (3) the intent to mislead another into reliance on that representation; (4) justifiable reliance on the representation; and (5) injury proximately resulting from that reliance. Burr v. Stark Cty. Bd. of Commrs., 23 Ohio St.3d 69, 491 N.E.2d.1101 (1986)

Id. at 139.

Black Bear in its motion for summary judgment argues it is entitled to judgment as a matter of law on YPS' fraudulent inducement claim. YPS in its brief in opposition to Black Bear's motion for summary judgment does not address its fraudulent inducement claim. In a prior submission made to this court, YPS informed the court that it did not oppose summary judgment being entered in favor of Black Bear with respect to the fraudulent inducement claim. (ECF No. 204 at 3.) The Third Circuit Court of Appeals has explained that "[j]udicial admissions are concessions in pleadings or briefs that bind the party who makes them." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 211 (3d Cir. 2006). The court considers YPS' assertion that it did not oppose summary judgment being entered against it with respect to Black Bear's summary judgment claim a judicial admission. Based upon the judicial admission and YPS' failure to address the fraudulent inducement claim in its response in opposition to Black Bear's motion for summary judgment, YPS failed to satisfy its burden under Rule 56 to point to specific parts of the record to show that there are material disputes of fact with respect to whether Black Bear fraudulently induced YPS to enter into the purchase orders for the platforms and skids. Summary judgment will, therefore, be granted in favor of Black Bear with respect to the fraudulent inducement claim.

### 2. Spoliation (Count III) against Black Bear and Kovacic

For the same reasons set forth above in the court's discussion of MarkWest's motion for summary judgment with respect to YPS' spoliation claim, YPS set forth factual allegations sufficient for a reasonable jury to find that Black Bear—under the direction of Kovacic as president of Black Bear— intentionally destroyed the skids to disrupt YPS' case, i.e., its right to cure the nonconformities in the skids. Black Bear's motion for summary judgment will, therefore, be denied with respect to YPS' claim for spoliation or interference with or destruction of evidence.

**3. Fraudulent Misrepresentation (Count V) and Fraudulent Concealment (Count VI) against Black Bear and Kovacic**

As discussed above, under Ohio law, the elements of fraudulent misrepresentation (or concealment) are:

(1) a representation or, when there is a duty to disclose, a concealment of a fact;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred;

(4) with the intent of misleading another into relying upon it;

(5) justifiable reliance on the representation or concealment; and

(6) an injury proximately caused by that reliance.

Laber, 126 F.Supp. 3d at 943.

Black Bear and Kovacic argue that their actions were not the proximate cause of YPS' damages and YPS did not rely upon any allegedly false statements or omissions made by Black Bear or Kovacic. (ECF No. 234 at 9-10.) YPS in its response in opposition to the motion for summary judgment filed by Black Bear and Kovacic did not address its fraudulent misrepresentation or fraudulent concealment claims against Black Bear or Kovacic. (ECF No. 246 at 8-11.) The court, however, cannot grant summary judgment in favor of Black Bear and Kovacic solely because YPS dd not object to their motion for summary judgment with respect to these claims. Black Bear and Kovacic are entitled to judgment as a matter of law only if the evidence of record supports such a finding. Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir.1990) ("Even though Rule 56(e) requires a nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial', it is 'well-settled ... that this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond.' "). The will court will, therefore, consider the arguments

raised by Black Bear and Kovacic to determine whether there is merit to their argument that they are entitled to judgment as a matter of law with respect to the claims of fraudulent misrepresentation and fraudulent concealment.

The focus of YPS' fraud claims against MarkWest are based upon Loosli's allegedly false representation to YPS that the second and third header skids would be delivered to the Humphreys Site and his omission that the skids would be delivered to the Barnesville facility to be reworked by Black Bear.[28] There is evidence of record that Black Bear knew Loosli instructed YPS to ship the second and third header skids to the *Humphreys Site* because Greco was on the telephone call during which Loosli provided those instructions to YPS. (MCCSMF (ECF No. 270) ¶¶ 10(a), 77.) A reasonable jury may find, therefore, that Black Bear had a duty to disclose the actual delivery location to "'dispel [the] misleading impressions[,]'" Blon, 519 N.E.2d at 367 (quoting Connelly, 174 F. Supp. at 58), created by Loosli. YPS, however, did not adduce evidence of record to show that it would not have suffered damages had Black Bear or Kovacic told YPS that the second and third header skids would be delivered to the Barnesville facility. In other words, YPS did not adduce evidence sufficient for a reasonable jury to find that Black Bear's fraudulent omission about the delivery location for the second and third header skids was the proximate cause of its damages.

---

[28] YPS in response to the concise statement of material facts presented by Black Bear and Kovacic "denies that the misrepresentations and concealments alleged by YPS are limited to misrepresentations and concealments about the last two Header Skids' delivery." (ECF No. 235 ¶ 29.) YPS, however, did not provide a record citation for its denial, and, as discussed above, did not address Black Bear's and Kovacic's motion for summary judgment with respect to the claims of fraudulent misrepresentation and fraudulent concealment. Under those circumstances, to the extent YPS' fraud claims against Black Bear and Kovacic are based upon other false statements or material omissions, YPS did not satisfy its Rule 56 burden with respect to those claims. DeShields v. Int'l Resort Properties Ltd., 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for…[the plaintiff's] claim existed in the record, it was incumbent upon her to direct the District Court's attention to those facts.") (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

As described above, the court discerns that YPS' damages are the result of Black Bear's failure to pay the full contract price for the platforms and four skids. The undisputed evidence of record shows that at the time YPS shipped the second and third header skids, Black Bear had already informed YPS about the alleged deficiencies in the skids and Black Bear and MarkWest informed YPS that work would be performed on the skids. There was no evidence presented upon which a reasonable jury may infer that Black Bear would have paid YPS the full contract price for the skids if Loosli told YPS that the second and third header skids were going to be delivered to the Barnesville facility. Under those circumstances, YPS failed to adduce evidence that Black Bear's or Kovacic's fraudulent omission about the delivery location of the second and third header skids was the proximate cause of its injuries. Black Bear and Kovacic[29] are, therefore, entitled to summary judgment with respect to YPS' claims for fraudulent misrepresentation and fraudulent concealment.

### 4. Civil Conspiracy (Count VII) against Black Bear and Kovacic

For the same reasons set forth above with respect to MarkWest's motion for summary judgment on YPS' civil conspiracy claim, Black Bear and Kovacic's motion for summary judgment on this claim will be denied.

## VI.  Conclusion

---

[29] Black Bear and Kovacic also argue that because YPS was contractually obligated to provide the second and third header skids to Black Bear, it cannot show that it justifiably relied upon the false statement or omissions about the delivery location to ship the second and third header skids. Black Bear and Kovacic are correct; YPS' contractual obligation to provide to Black Bear the second and third header skids arose when it entered into the purchase orders with Black Bear. The obligation to ship the second and third header skids did not, therefore, arise from any representation or omission by Black Bear or Kovacic. In other words, YPS failed to adduce evidence sufficient for a reasonable jury to find that YPS justifiably relied upon Black Bear or Kovacic's false representations or omissions about the delivery location of the second and third header skids. See  Wamen v. Goodyear Tire & Rubber Co., No. 5:13CV1084, 2014 WL 185901, at *7 (N.D. Ohio Jan. 15, 2014), aff'd, 580 F. App'x 457 (6th Cir. 2014) (citing Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 507 (6th Cir.2003); Lucas Ford, LLC v. Ford Motor Credit Co., No. 3:09CV451, 2011 WL 1831739, at *5 (N.D.Ohio May 12, 2011)).

The motion for summary judgment (ECF No. 238) filed by YPS will be denied. The motions for summary judgment filed by MarkWest (ECF No. 231) and Black Bear and Kovacic (ECF No. 233) will be denied with respect to the claim of tortious interference with contractual relations against MarkWest and claims of spoliation and civil conspiracy against MarkWest, Black Bear, and Kovacic; the motions filed by MarkWest and Black Bear and Kovacic will be granted in all other respects.

An appropriate order will be entered.

BY THE COURT:

Dated: March 18, 2020               /s/ JOY FLOWERS CONTI
                                                  Joy Flowers Conti
                                                  Senior United States District Judge